713 F.2d 1568
 4 ITRD 2297, 1 Fed. Cir. (T) 130
 SMITH-CORONA GROUP, Consumer Products Division, SCM
Corporation, Appellant,
v.
The UNITED STATES, Appellee,
and
Brother Industries, Ltd., Brother International Corporation,
Silver Seiko, Ltd., and Silver Reed America, Inc.,
Parties-in-Interest.
 Appeal No. 82-24.
 United States Court of Appeals,
Federal Circuit.
 Aug. 9, 1983.
 
 Eugene L. Stewart, Washington, D.C., argued for appellant; with him on brief was Terence P. Stewart, Washington, D.C.; Richard J. Sexton and Edwin Silverstone, New York City, of counsel.
 Velta A. Melnbrencis, Washington, D.C., argued for appellee. With her on brief were J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director and Francis J. Sailer, Washington, D.C.
 Wesley K. Caine, Washington, D.C., argued for Brother Industries, Ltd. and Brother Intern. Corp. With him on brief were H. William Tanaka and Donald L.E. Ritger, Washington, D.C.
 William H. Barringer, Washington, D.C., argued for Silver Seiko Ltd. and Silver Reed America, Inc. With him on brief were Noel Hemmendinger and Christopher Dunn, Washington, D.C.
 Frederick L. Ikenson and J. Eric Nissley, Washington, D.C. and Philip J. Curtis, Glenview, Ill., were on brief for Zenith Radio Corp., amicus curiae.
 Before RICH, Circuit Judge, SKELTON, Senior Circuit Judge, and SMITH, Circuit Judge.
 EDWARD S. SMITH, Circuit Judge.
 
 
 1
 This appeal presents a challenge to various price adjustments granted to the foreign manufacturers and importers of the subject merchandise by the U.S. International Trade Administration (ITA) in determining antidumping duties under 19 U.S.C. §§ 1673 et seq. (Supp. V 1981). Appellant, a domestic manufacturer, appeals the April 30, 1982, decision and order of the U.S. Court of International Trade[1] (CIT) denying appellant's motion for summary judgment, granting the Government's motion for summary judgment, and dissolving the preliminary injunction that had previously been issued.[2] We affirm.
 
 I.
 
 2
 Appellant, Smith-Corona Group, Consumer Products Division, SCM Corporation (Smith-Corona), is the last remaining domestic manufacturer of portable electric typewriters. Brother Industries, Ltd., and Brother International Corp. (collectively Brother) are, respectively, a Japanese manufacturer and an importer of portable electric typewriters from Japan. Intervenors, Silver Seiko, Ltd., and Silver Reed America, Inc. (collectively Silver), also are, respectively, a Japanese manufacturer and an importer of the subject merchandise from Japan.
 
 
 3
 On August 13, 1980, Commerce published in the Federal Register its "Early Determination of Antidumping Duties."[3] This determination concerns certain portable electric typewriters from Japan manufactured and imported by Brother and Silver and entered or withdrawn from warehouse on or after January 4, 1980, through May 7, 1980. As part of the early determination, certain adjustments were made to foreign market value, reducing substantially the estimated dumping margins.[4] Smith-Corona appealed to the CIT. On April 30, 1982, the CIT filed a memorandum and order affirming the August 13, 1980, Early Determination of Antidumping Duties in all respects. The instant appeal by Smith-Corona is from that judgment.
 
 II.
 
 4
 The Tariff Act of 1930, as amended by the Trade Agreements Act of 1979,[5] establishes an intricate framework for the imposition of antidumping duties in appropriate circumstances. The number of factors involved, complicated by the difficulty in quantification of these factors and the foreign policy repercussions of a dumping determination, makes the enforcement of the antidumping law a difficult and supremely delicate endeavor. The Secretary of Commerce (Secretary) has been entrusted with responsibility for implementing the antidumping law.[6] The Secretary has broad discretion in executing the law. While the law does not expressly limit the exercise of that discretion with precise standards or guidelines, some general standards are apparent and these must be followed. The Secretary cannot, under the mantle of discretion, violate these standards or interpret them out of existence.
 
 A.
 
 5
 The Antidumping Act provides that if foreign merchandise is sold or is likely to be sold in the United States at less than its fair value to the material injury of a United States industry, then an additional antidumping duty shall be imposed.[7] The amount of the duty shall equal the amount by which the foreign market value exceeds the United States price for the merchandise.
 
 
 6
 Foreign market value and United States price represent prices in different markets affected by a variety of differences in the chain of commerce by which the merchandise reached the export or domestic market. Both values are subject to adjustment in an attempt to reconstruct the price at a specific, "common" point in the chain of commerce, so that value can be fairly compared on an equivalent basis. While the statute does not specify where in the chain of commerce price is constructed, the specific statutory adjustments appear to indicate an "f.o.b. foreign port" price.
 
 
 7
 United States price, as defined in section 1677a,[8] is computed by one of two methods: purchase price or exporter's sales price. The antidumping law attempts to construct value on the basis of arm's length transactions. The arm's length sale takes place at different points in the chain of commerce depending on whether the goods traveled through a related importer or through an independent, unrelated importer. Thus, different methods of computation of United States price are required depending on the relationship of the importer to the foreign producer.
 
 
 8
 Where the importer is an unrelated, independent party, purchase price is used. Purchase price is the actual or agreed-to price between the foreign producer and the independent importer, prior to the time of importation. Where the importer is related, an arm's length transaction does not occur until the goods are resold to a retailer or to the public. In that case, "exporter's sales price" is used. Exporter's sales price is the price at which the goods are eventually transferred in an arm's length transaction, whether from the importer to an independent retailer or directly to the public.
 
 
 9
 Both purchase price and exporter's sales price are subject to adjustment in order to derive a "fair" United States price for comparison with foreign market value. The adjustments provided in section 1677a(d) are applicable to both purchase price and exporter's sales price. The additional adjustments provided in section 1677a(e) are applicable only to exporter's sales price.[9]
 
 
 10
 On the other side of the scale, foreign market value is also computed on the basis of arm's length transactions by one of three methods:[10] (1) home market sales; (2) third country sales; or (3) constructed value. The home market sales method is preferred. In the absence of such home market sales, the statute provides that either third country sales or constructed value may be used. Foreign market value, computed on the basis of home market sales or third country sales, is subject to adjustment as provided in section 1677b(a)(4) to generate an f.o.b. foreign port value.[11]
 
 
 11
 Thus, the ITA, using either purchase price or exporter's sales price, computes and adjusts the United States price of the merchandise. Additionally, the ITA, on the basis of either home market sales, or third country sales, or constructed value, computes and adjusts the foreign market value of the merchandise. These values, which should be on an equivalent basis after adjustment, are then compared and the amount by which foreign market value exceeds United States price is imposed as an additional antidumping duty.
 
 B.
 
 12
 The ITA determined that the United States prices of portable electric typewriters from Japan, produced by Brother and Silver, are less than the foreign market values of such or similar typewriters. United States price was based on purchase price or exporter's sale price, as appropriate for any particular sale. Foreign market value was computed on the basis of home market sales by Brother and Silver of similar models for all of the entries subject to the antidumping duty. Brother and Silver received the benefit of a panoply of adjustments to foreign market value,[12] several of which are challenged by Smith-Corona.III.
 
 
 13
 All of the adjustments challenged by Smith-Corona are adjustments to foreign market value. Specifically, Smith-Corona attacks the validity of two regulations under which several of the adjustments were made as well as the amounts of three of the specific adjustments granted to Brother and Silver.
 
 
 14
 In 1980, Commerce promulgated the antidumping duty regulations[13] at issue in this appeal. In order to facilitate adjustments for "other differences in circumstances of sale," under section 1677b(a)(4)(B), Commerce promulgated 19 C.F.R. § 353.15. That regulation sets out specific classes of adjustments[14] and provides criteria for determining the amount of allowances under section 1677b(a)(4)(B). 19 C.F.R. § 353.15(d) (1980) provides:
 
 
 15
 In determining the amount of the reasonable allowances for any differences in circumstances of sale, the Secretary will be guided primarily by the cost of such differences to the seller, but, where appropriate, he may also consider the effect of such differences upon the market value of the merchandise.
 
 
 16
 Smith-Corona attacks 19 C.F.R. § 353.15(d) on the ground that the regulation establishes a preference for cost that is inconsistent with the express requirement of section 1677b(a)(4) that differences in price or value must be due to differences in circumstances of sale.[15]
 
 
 17
 The regulation also provides a special adjustment not provided in the statute, the so-called "special rule"--the exporter's sales price offset:[16]
 
 
 18
 (c) Special rule. Notwithstanding the criteria for adjustments for differences in circumstances of sale set forth in paragraphs (a) and (b) of this section, * * * [i]n making comparisons using exporter's sales price, reasonable allowance will be made for all actual selling expenses incurred in the home market up to the amount of the selling expenses incurred in the United States market.
 
 
 19
 Smith-Corona challenges the exporter's sales price offset as being wholly inconsistent with the adjustments provided in the statute. Smith-Corona argues that the exporter's sales price offset is invalid because it contravenes certain adjustments to exporter's sales price provided in section 1677a(e)(2).
 
 
 20
 The remaining three challenges are to the amounts of three specific adjustments. With respect to these three specific adjustments to foreign market value, two were based on section 1677b(a)(4) providing adjustments for differences in the circumstances of sale. The third challenge is to the amount of adjustments to foreign market value under 19 C.F.R. § 353.16 (1980) for differences in the physical characteristics of the merchandise. Smith-Corona does not attack the validity of either section 1677b(a)(4) or 19 C.F.R. § 353.16 but, rather, it attacks the amount of each adjustment. Brother, Silver, and the United States all support the correctness of the amounts of these three specific adjustments as well as the validity of 19 C.F.R. §§ 353.15(c) and (d).[17]
 
 
 21
 Thus, to summarize, the issues presented in this appeal are
 
 
 22
 (1) whether 19 C.F.R. § 353.15(d), which allows the administering authority to compute allowances for differences in the circumstances of sale on the basis of cost, is valid (part IV.A of this opinion);
 
 
 23
 (2) whether 19 C.F.R. § 353.15(c), the exporter's sales price offset, is valid (part IV.B of this opinion);
 
 
 24
 (3) whether it was error to adjust foreign market value for after sale rebates as differences in the circumstances of sale (part V.A of this opinion);
 
 
 25
 (4) whether it was error to adjust foreign market value for advertising expenses as differences in the circumstances of sale (part V.B of this opinion); and
 
 
 26
 (5) whether it was error to adjust foreign market value for accessories and printed materials as differences in the physical characteristics of the merchandise (part V.C of this opinion).
 
 IV.
 
 27
 With respect to the validity of the challenged regulations, the relevant inquiries are whether the regulations are a proper exercise of the Secretary's authority and are reasonable.[18] In determining the reasonableness of the regulations, we are guided by the normal aids of statutory construction: statutory language; legislative history; and legislative purpose.
 
 A.
 
 28
 In making adjustments to foreign market value for differences in circumstances of sale, 19 C.F.R. § 353.15(d) provides that the Secretary shall be guided primarily by the cost of such differences. Smith-Corona argues that reliance on cost, without any evidence of the effect of cost on price, violates the statute's explicit requirement that price or value differences be caused by differences in the circumstances of sale. The CIT, in a thoughtful and comprehensive opinion, held the regulation valid. In doing so, Judge Newman, writing for the court, relied on the Secretary's wide discretion under section 1677b(a)(4), the economic logic of the assumption that cost is related to price, and the long-standing administrative practice of using cost.
 
 
 29
 The express language of section 1677b(a)(4) provides that allowances will be made if it is established to the satisfaction of the Secretary that the amount of any difference between the United States price and the foreign market value of the merchandise is wholly or partly due to differences in circumstances of sale.[19] The statute does not expressly limit the exercise of the Secretary's authority to determine adjustments, nor does it include precise standards or guidelines to govern the exercise of that authority. Additionally, the statute does not define the term "circumstances of sale" nor does it prescribe any method for determining allowances. Congress has deferred to the Secretary's expertise in this matter.
 
 
 30
 The language of the statute, as Smith-Corona and Zenith correctly point out, specifies that adjustments are to be made on the basis of differences in price or value. This approach is followed consistently throughout the antidumping law. Cost is generally relied upon only when value cannot readily be determined from price.
 
 
 31
 Antidumping duties are imposed on the basis of differences in value, not differences in cost. The importation of foreign merchandise can occur at a price greater than cost, yet still generate liability for an antidumping duty. The language of the statute would impose a duty on a foreign producer who "eats" either costs or profits in the American market relative to the home market. Thus, cost criteria alone will not redress the full margin of dumping to which Congress sought to attach an antidumping duty. Value must be considered under the statute.
 
 
 32
 Yet, the statute does not explicitly forbid reliance on cost. It even encourages the use of cost to fix foreign market value in some limited circumstances.[20] Additionally, the statute does vest broad discretion in the Secretary. Absent a specific provision forbidding cost-based adjustments, we cannot say that the express language of the statute clearly invalidates the challenged regulation, though it does cast shadows upon it.
 
 
 33
 The legislative history of the Trade Agreements Act of 1979, unfortunately, nowhere expressly addresses the use of cost to establish adjustments for differences in circumstances of sale.[21] The legislative history does, however, reflect general theoretical conflicts in legislative purpose.
 
 
 34
 Congress sought to afford the domestic manufacturer strong protection against dumping, seeming to indicate that the Secretary should err in favor of protectionism. The legislative history reflects a long felt and understandable congressional distrust of cost as a basis for the computation of dumping margins. Dumping is a prime example of unfair competition in which a foreign manufacturer ignores the normal market relationships of cost to price. Hence, cost is subject to manipulation and Congress has recognized its inherent unreliability. The legislative reports on the act also reflect a general dissatisfaction with administration of the prior antidumping law.
 
 
 35
 On the other hand, the Secretary is directed to make a fair and equitable valuation, which may reduce the antidumping margin as a result of downward adjustments to foreign market value. The 1979 act also shortened the time limits governing dumping determinations, mandating greater speed and, consequently, the necessity for using readily available, reliable information in the computation of duties.
 
 
 36
 No clear legislative intent or purpose emerges from the legislative history with respect to the use of cost. Thus, legislative history and purpose offer little aid in resolving this issue.
 
 
 37
 Some degree of deference is due the interpretation of the expert authority charged with the enforcement of the statute. The CIT felt that deference should be heightened by the Secretary's long-standing interpretation of the statute and by legislative acquiescence in that interpretation. We are not convinced, however, that the degree of deference accorded the Secretary's interpretation by the CIT was proper.
 
 
 38
 The Senate report expressly provides that Congress did not intend to express either approval or disapproval of the current regulations or administrative practice.[22] Thus, in terms of acquiescence, the most that can be said is that the Secretary's interpretation is cloaked with the diaphanous veil of a legislative "no comment."
 
 
 39
 Similarly weak is the argument that the regulation is long standing. The regulation was published in 1976,[23] and thus was hardly contemporaneous with the 1979 enactment of the implementing legislation, section 1677b(a)(4), 3 years later.[24] The regulation prior to 1976 did not articulate a preference for cost. It differs from the regulation in effect after 1976 in precisely the area which is in dispute.[25]
 
 
 40
 This issue distills to the question whether a "causal link" must be established between the differences in circumstances of sale and the differential between United States price and foreign market value. The implicit assumption of 19 C.F.R. § 353.15(d) is that such differences very likely exist where there exist differences in cost. Judge Newman's well-reasoned opinion handles the "causal link" issue well. With the exception of his carrying back the date of the administrative practice reflected in the regulations we agree with his handling of this and all of the issues in this appeal.
 
 
 41
 Although the statutory language places primary reliance on the use of value and price, it gives the Secretary broad discretion in making adjustments. We conclude that the Secretary did not abuse that discretion by relying on the use of cost to make circumstances of sales adjustments.[26] The statute's primary reliance on value is not carried forward by language that would explicitly limit the discretion expressly granted the Secretary or would countermand the manner in which that discretion has been exercised in 19 C.F.R. § 353.15(d). The Secretary may not, however, rely on cost to the exclusion of its effect on value. The regulation does not prohibit reliance on value, but merely expresses a preference for cost; value may be considered, where appropriate. The Secretary must complete the determination within rigid time limits. The use of cost data may be the only reliable indicia of value.[27] We hold, therefore, that 19 C.F.R. § 353.15(d) is a proper exercise of the Secretary's authority and is reasonable. Thus, 19 C.F.R. § 353.15(d), insofar as it is challenged here, is valid.
 
 B.
 
 42
 The exporter's sales price offset[28] is supported by the Government as a means to redress a perceived unfairness in the computation of foreign market value under the statute. Section 1677a(e)(2) provides for certain adjustments to exporter's sales price (United States price), which adjustments increase the dumping margin. The challenged offset allows adjustments to foreign market value, which offset reduces the margin. Smith-Corona argues that the offset thus renders section 1677a(e)(2) void and is, therefore, invalid.
 
 
 43
 The statute provides for the adjustment of United States price for certain specified "direct costs."[29] Section 1677a(e), however, provides for the adjustment of only exporter's sales price for certain "indirect costs"--selling expenses.[30] Commerce perceived that the United States price based on exporter's sales price was distorted by the adjustment for indirect costs and, accordingly, promulgated 19 C.F.R. § 353.15(c) to afford a similar adjustment to foreign market value.[31] Smith-Corona contends that the offset establishes two different fair value comparisons as a function of the basis for the computation of United States price. This allegedly contravenes the use of only one fair value by the statute. Arguably, regardless of the basis of United States price, purchase price or exporter's sales price, the same antidumping margin should result. Smith-Corona also argues that the statute establishes the fair value comparison on an "f.o.b. foreign port" price basis, and since the offset perturbs this result, the offset is invalid.
 
 
 44
 The statute does refer repeatedly to foreign market value, as if there were only one foreign market value under consideration. Yet, the statute does not expressly foreclose the use of two different United States price-foreign market value comparisons. Given the two methods of computation of United States price, it is apparent that the final United States price may be affected by the basis for the computation. United States price computed on the basis of exporter's sales price may result in an f.o.b. foreign port price less specified selling expenses. Computed on the basis of purchase price, United States price will generally be an f.o.b. foreign port price, including selling expenses. Given the differences in adjustments, it is apparent that the statute does not compel United States price to be the same irrespective of the method of computation.
 
 
 45
 In view of the statutory requirement of a direct relationship between circumstances of sale and the relevant transaction, the statutory deduction of selling expense from exporter's sales price, section 1677a(e), is somewhat anomalous. The absence of any such statutory adjustment to foreign market value, however, is entirely consistent with the statute's reliance on "direct costs." Thus, the challenged offset is inconsistent with the general requirement of a direct relation. It shares that inconsistency, however, with the statutory adjustment that it counteracts.
 
 
 46
 One of the goals of the statute is to guarantee that the administering authority makes the fair value comparison on a fair basis--comparing apples with apples. The offset appears to generate two fair value comparisons, apples with apples (purchase price) and oranges with oranges (exporter's sales price). The difference between United States price generated from purchase price and from exporter's sales price was created by the statute. Were it not for the exporter's sales price offset, comparisons based on purchase price would be fair, yet comparisons based on exporter's sales price would be skewed in favor of a higher dumping margin. We do not believe that the statute requires the Secretary to compare both apples and oranges with only apples. Rather, it expressly requires a fair comparison. The offset is an attempt to achieve such a comparison.
 
 
 47
 As was the case with subsection (d), the legislative history and the legislative purpose are ambiguous on this question. The offset issue was not addressed substantively in the Trade Agreements Act of 1979. The legislative history does contain general statements to the effect that the Secretary should be both firm and fair. Yet, these generalities are not helpful in determining the validity of the offset.
 
 
 48
 The Secretary's interpretation is entitled to consideration, but here again, we cannot agree with the CIT that the Secretary's interpretation is entitled to heightened deference by virtue of either the long-standing application of that regulation or legislative acquiescence. The offset was originally published in 1976.[32] It was criticized by congressional committees and internally in the Commerce Department as being inconsistent with the statute's insistence on a direct relationship to the sales under consideration. Although Congress made no move against the offset, neither did it endorse it in the Trade Agreements Act of 1979.
 
 
 49
 The statutory language, therefore, is the only compelling evidence of record regarding the validity of the offset. Although the statute expressly requires a direct relationship between the differences in circumstances of sale and adjustments to foreign market value, we cannot conclude that the administering authority acted either beyond its authority or unreasonably in promulgating the offset. The offset does permit negation of one specific statutory adjustment to exporter's sales price, but does so to achieve a broader statutory purpose otherwise frustrated because of the alternative statutory methods of computing United States price.
 
 
 50
 The main problem with the offset is that it is not based on directly related costs, nor is it based on differences in the circumstances of sale but, rather, on similarities. Yet, these limitations are tempered by the very structure of the fair value computation under the statute. If the statute is skewed by the offset it is because the Secretary, in constructing a fair comparison, has erected the offset on a foundation that was already slightly askew. In view of the discretion accorded the Secretary under the statute to make adjustments to foreign market value, we conclude that the exporter's sales price offset, 19 C.F.R. § 353.15(c) is a proper and reasonable exercise of the Secretary's authority to administer the statute fairly. Thus, insofar as it is challenged here, 19 C.F.R. § 353.15(c) is valid.
 
 V.
 
 51
 In terms of the amounts of the specific adjustments for differences in circumstances of sales and in the physical characteristics of the merchandise, the question is whether the adjustments were made in accordance with the statute and implementing regulations and whether the adjustments are supported by substantial evidence.[33]
 
 A.
 
 52
 The ITA made adjustments, for after-sale rebates, to the foreign market value of portable electric typewriters imported into the United States by both Brother and Silver. Rebates were given on specific models as well as on total sales. Smith-Corona challenges only those adjustments for rebates based on total sales--for which some apportionment computation was required.
 
 
 53
 Silver granted volume rebates to Japanese customers for purchases of targeted quantities of certain Silver typewriters. Commerce computed the adjustments on the basis of expense to Silver. Silver granted rebates on sales of portable electric typewriters and other merchandise, necessitating apportionment of the rebate expense. Commerce initially computed the ratio of the total sales amount of portable electric typewriters to the total sales amount of all merchandise subject to the rebate program. This ratio, multiplied by the total amount of rebate paid, yields the total amount of rebate paid for portable electric typewriter sales. Commerce then computed the ratio of the sales amount of each model of portable electric typewriter to the total sales of all portable electric typewriters and multiplied this figure by the total amount of rebate paid for portable electric typewriters to yield the yen amount of rebate paid for each model of portable electric typewriter. That figure, divided by the quantity of each model sold, yields the rebate amount per unit allowed as an adjustment to foreign market value.
 
 
 54
 Two of Brother's rebate programs are challenged: periodic and monthly. With respect to a portion of the recipients of the monthly rebate, the rebate was a fixed amount per unit, determined on the basis of the total number of all typewriters purchased. The remaining monthly rebates, based on a percentage of the total volume of portable electric typewriter sales, were computed by apportioning the expense among the various models sold and dividing by the quantity of each model sold to yield a per unit amount. With respect to periodic rebates, the total fixed yen amount of the rebate was divided by the total number of typewriters sold subject to the rebate to yield a per unit amount. Thus, the rebates were calculated directly from actual sales figures and from the total amount of rebate paid.
 
 
 55
 Smith-Corona challenges these specific rebates as not directly related to the sales under consideration because they were based on total sales. Allegedly, the rebates are not identified with specific sales and are not properly quantifiable and, therefore, not properly subject to adjustment.
 
 
 56
 The statute requires that the adjustment be for differences in circumstances of sales. Brother and Silver both offer the rebate in Japan and not in America. Thus, the rebates constitute differences that may be adjustable. The rebates based on total sales were apportioned, as described above, in an attempt to correlate the rebates with the appropriate sales of portable electric typewriters within the pool of merchandise upon which the rebates were based. Relying on F.W. Myers & Co. v. United States,[34] Smith-Corona alleges that this apportionment is not adequate to establish a direct relationship to the sales under consideration.
 
 
 57
 In Myers, the Customs Court held that differences in circumstances of sale must have a reasonably direct relationship to the sales under consideration,[35] and that value determinations must be based on proof of actual costs not on estimates, approximations, or averages.[36] While Myers is not controlling here, we note that the adjustments nonetheless satisfy both criteria.
 
 
 58
 The rebates were actually paid on the sales under consideration. The effective cost to the manufacturer of the specific transactions subject to the rebates was increased by the amount of the rebates. More importantly, the apportionment of rebate cost was made on the basis of actual cost and sales figures. Despite the necessity of apportionment calculations to unravel the rebate transactions, the cost of the rebates can be directly correlated with specific merchandise using verified cost and sales information. While it would be simpler to make adjustments for a more direct rebate scheme, the necessity to undertake a straightforward mathematical analysis on the basis of verified, actual cost and sales data does not deprive these rebates of their direct relationship to the sales under consideration.
 
 
 59
 We conclude therefore that, in allowing these adjustments, the ITA acted within the framework of the statute and regulations and that the adjustments were based on substantial evidence.
 
 B.
 
 60
 Commerce also made certain adjustments to foreign market value, under 19 C.F.R. § 353.15(b), for certain "direct" advertising expenses incurred by Brother in the home market. The ITA allowed adjustments for 12 advertisements financed by Brother and aimed at the ultimate consumer. Some of these ads were for multiple products or involved a commemorative announcement. Commerce considered the adjustments to be for direct advertising expenses that were attributable to a later sale by a purchaser.
 
 
 61
 Smith-Corona challenges the adjustments for multiple product advertising and for institutional advertising as violative of the specific limitations of 19 C.F.R. § 353.15(b).[37] Smith-Corona argues that the challenged advertisements did not constitute the assumption by a seller of the purchaser's costs and were not attributable to a later sale of the merchandise to a purchaser. Additionally, it is alleged that the lead time involved in supplying the demand generated by the ads negates the direct relationship of the advertisements to the relevant sales.
 
 
 62
 Commerce allowed only a portion of the expense for the challenged advertisements based on its apportionment of these expenses to sales of portable electric typewriters. While the challenged ads were not exclusively directed to the relevant merchandise, a portion of each advertising effort was. In a purely metaphysical sense, Smith-Corona is correct in that the ad expense cannot be directly correlated with specific sales. Yet, the statute does not deal in imponderables.
 
 
 63
 That portion of the advertising that featured portable electric typewriters was related to the expense of selling that merchandise. The presence of multiple products or institutional advertising in the same advertisement does not deprive the relevant portion of the advertisement of its direct relationship to the relevant sales.
 
 
 64
 Commerce accepted the direct relationship of the advertising expenses to the relevant sales without requiring evidence of the lead time involved in placing orders to meet the additional demand generated by the advertising. The statute establishes that the relationship between the difference in circumstances of sale and the particular sale be established to the satisfaction of the Secretary. There is no evidence of record to refute the Secretary's assumption. Thus, we cannot say that the Secretary abused his discretion in this regard. Nor can we say that the Secretary acted improperly in considering that quantum of evidence to be adequate. In the absence of evidence to the contrary, the Secretary could reasonably conclude that the advertising expense was related to sales during the relevant period. Thus, we must uphold the Secretary.
 
 
 65
 The ITA merely attempted to identify and isolate that portion of advertising expense that was properly adjustable. These direct expenses are differences in the circumstances of sale and, on the basis of the record before us, the direct relationship requirement of the statute and of the regulation has been satisfied.[38] The ITA apportioned the advertising expense on the basis of actual, verified cost data. We feel that this was entirely reasonable. We conclude, therefore, that the ITA acted within the framework of the statute and regulations and that the adjustments to foreign market value for Brother's "direct" advertising expense were supported by substantial evidence.
 
 C.
 
 66
 The ITA also made adjustments to foreign market value for differences in the physical characteristics of the goods under 19 C.F.R. § 353.16.[39] Certain allowances were based on accessories and printed materials furnished with the merchandise by Brother. Portable electric typewriters sold in Japan were accompanied by spare typewriter ribbons and a pamphlet including a text on how to type. The merchandise sold for export to America consisted of the typewriter, without accessories, and with a pamphlet that did not include a typing instruction text.
 
 
 67
 Smith-Corona argues that the definition of the subject "merchandise" should be limited to portable electric typewriters. Consequently, differences in accessories or the pamphlet would not constitute differences in the physical characteristics of the merchandise.
 
 
 68
 The ITA has defined the term differently, however, and our inquiry is at an end if that interpretation is reasonable. The statute attaches significance to differences in value. Accessories included in sales to one market could enhance the value of the merchandise in that market relative to the value in the market not provided with those accessories. There is no evidence of record tending to show that value was not enhanced. It is, therefore, reasonable for the ITA to make adjustments on the basis of those features as physical characteristics of the merchandise. We hold that the ITA acted within the framework of the statute and regulations and that the allowances for differences in the physical characteristics of the merchandise on the basis of accessories provided with the principal goods were supported by substantial evidence.
 
 VI.
 
 69
 Our review of the statute reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law. We find no specific limitation in the statute, nor do we find any evidence of record, that would compel reversal of the ITA's determinations in this proceeding. Insofar as they are challenged here, 19 C.F.R. §§ 353.15(c) and (d) constitute a proper exercise of the Secretary's authority under the antidumping law and are reasonable. Additionally, in determining the amounts of the three specific adjustments challenged by Smith-Corona, the ITA acted within the framework of the statute and regulations. The amounts of these specific adjustments are supported by substantial evidence. Accordingly, we affirm the judgment of the U.S. Court of International Trade sustaining the August 13, 1980, Early Determination of Antidumping Duties.
 
 
 70
 AFFIRMED.
 
 
 
 [1]
 Brother Indus., Ltd. v. United States, 540 F.Supp. 1341 (CIT 1982)
 
 
 [2]
 Smith-Corona Group, Consumer Prods. Div., SCM Corp. v. United States, 1 CIT 89, 507 F.Supp. 1015 (CIT 1980)
 
 
 [3]
 Early Determination of Antidumping Duties, 45 Fed.Reg. 53,853 (1980). On January 4, 1980, the Treasury Department published its tentative determination that certain portable electric typewriters from Japan were being sold in the United States at less than fair value. Withholding of Appraisement, 45 Fed.Reg. 1,220 (1980). The International Trade Administration, U.S. Department of Commerce (ITA), on May 9, 1980, published an "Antidumping Duty Order." 45 Fed.Reg. 30,618 (1980). Pursuant to that order, Brother and Silver were required to deposit estimated antidumping duties, pending liquidation of entries
 
 
 [4]
 The dumping margins were reduced from 48.70% ad valorem for Brother and 36.53% ad valorem for Silver to 5.31% ad valorem and 14.91% ad valorem, respectively
 
 
 [5]
 19 U.S.C. §§ 1673 et seq. (Supp. V 1981)
 
 
 [6]
 The Secretary of the Treasury was originally named as administering authority of the antidumping law. 19 U.S.C. § 1677(1) (Supp. V 1981). As noted by the CIT below, 540 F.Supp. at 1347 n. 4, almost all of Treasury's responsibilities were transferred to the Department of Commerce on January 2, 1980, pursuant to Reorganization Plan No. 3 of 1979, 44 Fed.Reg. 69,273 (1979). This appeal arose out of the Early Determination of Antidumping Duties by Commerce. See supra note 3
 
 
 [7]
 19 U.S.C. § 1673 (Supp. V 1981) provides:
 " § 1673. Imposition of antidumping duties
 "If--
 "(1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and
 "(2) the Commission determines that--
 "(A) an industry in the United States--
 "(i) is materially injured, or
 "(ii) is threatened with material injury, or
 "(B) the establishment of an industry in the United States is materially retarded,
 by reason of imports of that merchandise,
 then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise."
 
 
 [8]
 19 U.S.C. § 1677a provides:
 "(a) United States price
 "For purposes of this subtitle, the term 'United States price' means the purchase price, or the exporter's sales price, of the merchandise, whichever is appropriate.
 "(b) Purchase price
 "For purposes of this section, the term 'purchase price' means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from the manufacturer or producer of the merchandise for exportation to the United States. Appropriate adjustments for costs and expenses under subsection (d) of this section shall be made if they are not reflected in the price paid by the person by whom, or for whose account, the merchandise is imported.
 "(c) Exporter's sales price
 "For purposes of this section, the term 'exporter's sales price' means the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter, as adjusted under subsections (d) and (e) of this section."
 
 
 [9]
 19 U.S.C. § 1677a(e)(2) provides:
 "(e) Additional adjustments to exporter's sales price
 "For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of--
 * * *
 "(2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise, * * * [.]" (Emphasis supplied.)
 
 
 [10]
 19 U.S.C. § 1677b provides:
 " § 1677b. Foreign market value
 "(a) Determination; fictitious market; sales agencies
 * * *
 "(1) In general
 "The foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States--
 "(A) at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption, or
 "(B) if not so sold or offered for sale for home consumption, or if the administering authority determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which so sold or offered for sale for exportation to countries other than the United States,
 * * *
 "(2) Use of constructed value
 "If the administering authority determines that the foreign market value of imported merchandise cannot be determined under paragraph (1)(A), then, notwithstanding paragraph (1)(B), the foreign market value of the merchandise may be the constructed value of that merchandise, as determined under subsection (e) of this section.
 * * *
 "(e) Constructed value
 "(1) Determination
 "For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of--
 "(A) the cost of materials * * * and of fabrication * * *;
 "(B) an amount for general expenses and profit * * *; and
 "(C) the cost of * * * placing the merchandise under consideration in condition, packed ready for shipment to the United States."
 
 
 [11]
 19 U.S.C. § 1677b(a)(4) provides, in pertinent part:
 "(4) Other adjustments
 "In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to--
 * * *
 "(B) other differences in circumstances of sale; * * *
 * * *
 then due allowance shall be made therefor." (Emphasis supplied.)
 
 
 [12]
 Home market sales were used to compute foreign market value for both Japanese producers. In the case of Silver, with respect to sales for which United States price was computed on the basis of purchase price, adjustments to foreign market value were made for differences in inland freight, packing costs, physical characteristics of the merchandise, and cost of production. With respect to sales for which United States price was based on exporter's sales price, foreign market value was adjusted for differences in inland freight, in the circumstances of sale (advertising, warranty and after sales service, packing costs, and after sales rebates), in commission expenses, in the physical characteristics of the goods, and for the exporter's sales price offset (selling expenses in home market up to amount of selling expenses in United States market). In the case of Brother, with respect to sales for which United States price was computed on the basis of purchase price, adjustments to foreign market value were made for differences in inland freight, in the circumstances of sale (advertising and selling expenses, warranty, rebates, packing costs, and certain direct advertising expenses), and in the physical characteristics of the merchandise. With respect to comparisons based on exporter's sales price, foreign market value was adjusted for differences in inland freight, in the circumstances of sale (after sales rebates, advertising expenses, packing and warranty expenses), in commissions, in the physical characteristics of the merchandise, and for the exporter's sales price offset. 45 Fed.Reg. 53,853 (1980)
 
 
 [13]
 19 C.F.R. §§ 353.13-.23 (1980)
 
 
 [14]
 19 C.F.R. §§ 353.15(a), (b) (1980). Among those adjustments are advertising and selling expenses
 
 
 [15]
 See supra note 11
 
 
 [16]
 19 C.F.R. § 353.15(c) (1980)
 
 
 [17]
 The court is assisted, in its consideration of this appeal, by several amici curiae who have also submitted briefs: (1) Zenith Radio Corp.; and (2) several Japanese manufacturers and importers (Matsushita, Victor, USJVC, Sanyo, Hitachi, Toshiba, Sharp, Mitsubishi, and General). Zenith has adopted a position that substantially supports that taken by the domestic manufacturer, Smith-Corona. Similarly, the Japanese amici curiae substantially support the position taken by Brother, Silver, and the United States
 
 
 [18]
 See 5 U.S.C. § 706 (1976); Zenith Radio Corp. v. United States, 437 U.S. 443, 451, 98 S.Ct. 2441, 2445-2446, 57 L.Ed.2d 337 (1978)
 
 
 [19]
 See supra note 11
 
 
 [20]
 Constructed value is one such cost-based criterion. 19 U.S.C. § 1677b(a)(2). The Government seems to rely on this provision as legislative endorsement of the use of cost. We do not believe that it is. Constructed value is merely an attempt to reconstruct foreign market value by any suitable means from the available reliable evidence, not a blanket endorsement of the use of cost. Under § 1677b, although constructed value may be used without regard to the availability of a third country sales price, home market sales are clearly the preferred basis
 
 
 [21]
 S.Rep. No. 249, 96th Cong., 1st Sess. 1, reprinted in 1979 U.S.Code Cong. & Ad.News 381; H.R.Rep. No. 317, 96th Cong., 1st Sess. 1
 
 
 [22]
 S.Rep. No. 249, 96th Cong., 1st Sess. 96, reprinted in 1979 U.S.Code Cong. & Ad.News 381, 482
 
 
 [23]
 The regulation was originally promulgated at 41 Fed.Reg. 26,204 (1976) and was codified at 19 C.F.R. § 153.10 (1976)
 
 
 [24]
 Cf. Zenith Radio Corp., 437 U.S. at 451, 98 S.Ct. at 2445-2446 (an administrative practice has peculiar weight when it involves a contemporaneous construction of a statute by an agency with responsibility for implementing the statute--deference given 80-year-old interpretation first promulgated within 1 year of passage of the countervailing duty statute)
 
 
 [25]
 Prior to 1976, the regulation was based primarily on value (in accordance with the statutory preference for value), cost being relied on only where appropriate--a transposition of those terms in the present form of the regulation:
 "(c) Relation to market value. In determining the amount of the reasonable allowances for any differences in circumstances of sale, the Secretary will be guided primarily by the effect of such differences upon the market value of the merchandise but, where appropriate, may also consider the cost of such differences to the seller, as contributing to an estimate of market value." (Emphasis supplied.) 19 C.F.R. § 153.8(c) (1972).
 See 540 F.Supp. at 1351.
 
 
 [26]
 We do not hold that the Secretary may blindly rely on cost to the exclusion of its effect on value. Such would clearly violate the statute's primary reliance on value in the computation of antidumping duties, as well as its requirement of a direct relationship. We hold only that, absent evidence that costs do not reflect value, the Secretary may reasonably conclude that cost and value are directly related. Smith-Corona also argues that this would upset the burden of proof on the importer to establish entitlement to adjustments. We cannot agree. The use of cost criteria to satisfy the quantum of evidence required to establish entitlement is reasonable. Whatever the quantum of evidence that would "satisfy" the Secretary, once that evidence is adduced, the "burden" will be "shifted" in every case. Smith-Corona's remedy lies with Congress. Congress can provide more specific guidelines to govern the exercise of the Secretary's discretion; this court cannot
 
 
 [27]
 The ready availability of cost data that can be employed without extensive complex econometric analysis supports the reasonableness of the Secretary's decision to rely on cost. Cost may be the only practical way to administer the statute
 
 
 [28]
 19 C.F.R. § 353.15(c)
 
 
 [29]
 19 U.S.C. § 1677a(d)
 
 
 [30]
 19 U.S.C. § 1677a(e) provides, in pertinent part:
 "(e) Additional adjustments to exporter's sales price
 "For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of--
 * * *
 "(2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise, * * * [.]" (Emphasis supplied.)
 
 
 [31]
 19 C.F.R. § 353.15(c) (1980) provides:
 "(c) Special rule. Notwithstanding the criteria for adjustments for differences in circumstances of sale set forth in paragraphs (a) and (b) of this section, * * * [i]n making comparisons using exporter's sales price, reasonable allowance will be made for all actual selling expenses incurred in the home market up to the amount of the selling expenses incurred in the United States market." (Emphasis supplied.)
 
 
 [32]
 The offset was originally published at 41 Fed.Reg. 26,204 (1976) and was codified at 19 C.F.R. § 153.10(b) (1976)
 
 
 [33]
 5 U.S.C. § 706
 
 
 [34]
 F.W. Myers & Co. v. United States, 376 F.Supp. 860 (Cust.Ct.1974)
 
 
 [35]
 Id. at 872
 
 
 [36]
 Id. at 873
 
 
 [37]
 19 C.F.R. § 353.15(b) (1980) provides, in pertinent part:
 " § 353.15 Differences in circumstances of sale.
 * * *
 "(b) Examples. Examples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving * * * assumption by a seller of a purchaser's advertising or other selling costs. * * * Allowances generally will not be made for differences in advertising and other selling costs of a seller, unless such costs are attributable to a later sale of the merchandise by a purchaser." (Emphasis supplied.)
 
 
 [38]
 19 U.S.C. § 1677b(a)(4)(B); 19 C.F.R. § 353.15(a)
 
 
 [39]
 19 C.F.R. § 353.16 (1980) provides:
 " § 353.16 Differences in physical characteristics.
 "In comparing the United States price with the selling price in the home market, or for exportation to countries other than the United States in the case of similar merchandise, due allowance shall be made for differences in the physical characteristics of the merchandise in the markets being compared. In this regard, the Secretary will be guided primarily by the differences in cost of production, to the extent that it is established to his satisfaction that the amount of any price differential is wholly or partly due to such differences, but, when appropriate, the effect of such differences upon the market value of the merchandise may also be considered. In the case of merchandise which does not lend itself to comparison with other merchandise for the purpose of this section, any method reasonably calculated to reflect the impact on cost or value of any differences in the merchandise under consideration may be used. Differences in costs of producing merchandise with identical physical characteristics as end products will not be considered appropriate adjustments." (Emphasis supplied.)