**ZENITH RADIO CORPORATION,
et al., Plaintiffs,**

v.

**UNITED STATES, et al., Defendants.**

**Court No. 81–06–00734.**

United States Court of
International Trade.

March 13, 1985.

Frederick L. Ikenson, P.C., Washington, D.C. (Frederick L. Ikenson and J. Eric Nissley, Washington, D.C., of counsel), for plaintiff Zenith Radio Corporation.

Collier, Shannon, Rill & Scott, Washington, D.C. (Paul D. Cullen and Paul C. Rosenthal, Washington, D.C., of counsel), for plaintiffs International Brotherhood of Electrical Workers, et al.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch (Sheila N. Ziff, Washington, D.C., attorney), for defendants.

Weil, Gotshal & Manges, New York City, (A. Paul Victor, Stuart M. Rosen, Charles H. Bayar, and Bret E. Suval, New York City, of counsel), for defendant-intervenors, Matsushita Electric Industrial Co., Ltd., et al.

Tanaka Walders & Ritger, Washington, D.C. (H. William Tanaka, Lawrence R. Walders, Patrick O'Leary, Washington, D.C., of counsel), for defendant-intervenors, Hitachi Ltd., et al.

Sharretts, Paley, Carter & Blauvelt, P.C., New York City (Gail T. Cumins and Ned H. Marshak, New York City, of counsel), for defendant-intervenor Sanyo Electric, Inc.

Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (Robert H. Huey and Rodney F. Page, Washington, D.C., of counsel), for defendant-intervenors, Toshiba Corporation, et al.

Wender, Murase & White, New York City (Peter J. Gartland and Robert D. Piliero, New York City, of counsel), for defendant-intervenor Sharp Electronics Corporation.

Baker & McKenzie, Washington, D.C. (Thomas P. Ondeck, Washington, D.C., of counsel), for defendant-intervenors Mitsubishi Electric Corporation, et al.

Siegel, Mandell & Davidson, P.C., New York City (Brian S. Goldstein and Edward Ackerman, New York City, of counsel), for defendant-intervenor The General Corporation of Japan.

*Memorandum Opinion and Order*
WATSON, Judge:

This consolidated action is a judicial review of a determination by the International Trade Administration of the Department of Commerce (ITA). It is before the Court on cross-motions for summary judgment.

The determination in dispute [1] fixed the antidumping duties due on television sets from Japan that were entered or withdrawn from warehouse for consumption between April 1, 1979 and March 31, 1980.

Under the law, if the United States Price is less than the Foreign Market Value the difference between the two is a margin of dumping in the United States and antidumping duties must be paid to eliminate it. 19 U.S.C. § 1673.[2]

The determination of Foreign Market Value starts with the price in the producer's home market. 19 U.S.C. § 1677b(a)(1)(A) [3] Certain costs (such as containers and coverings) are then added to the price. Finally, "adjustments" may be made to the price for those elements in the price which are "differences in circumstances of sale." 19 U.S.C. § 1677b(a)(4).[4]

If the price method cannot be applied with information from home market

---

**1.** The determination was published at 46 Fed. Reg. 30163 (June 5, 1981).

**2.** 19 U.S.C. § 1673

**1673. Imposition of antidumping duties imposed**
If—
(1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and
(2) the Commission determines that—
(A) an industry in the United States—
(i) is materially injured, or
(ii) is threatened with material injury, or
(B) the establishment of an industry in the United States is materially retarded,
by reason of imports of that merchandise, then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise.

**3.** 19 U.S.C. § 1677b(a)(1)(A)
§ 1677b. **Foreign market value**
(a) Determination; fictitious market; sales agencies. For purposes of this title—
(1) In general. The foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States—

(A) at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption....

**4.** 19 U.S.C. § 1677b(a)(4)
(4) Other adjustments. In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—
(A) the fact that the wholesale quantities, in which such or similar merchandise is sold or, in the absence of sales, offered for sale, for exportation to, or in the principal market of, the United States, as appropriate, in the ordinary course of trade, are less or are greater than the wholesale quantities in which such or similar merchandise is sold or, in the absence of sales, offered for sale, in the principal markets of the country of exportation in the ordinary course of trade for home consumption (or, if not so sold for home consumption, then for exportation to countries other than the United States);
(B) other differences in circumstances of sale; or

sources, the Foreign Market Value can be determined from a price method using sales to third countries other than the United States (19 U.S.C. § 1677b(a)(1)(B)) or from a non-price method known as Constructed Value, in which the value is built up from the elements of costs of materials, cost of production and general expenses and profit. 19 U.S.C. § 1677b(a)(2) [5] and 19 U.S.C. § 1677b(e).[6]

The plaintiffs claim that the ITA committed errors of law in its determination of the Foreign Market Value of the television sets under investigation.

## I

■ Plaintiffs first argue that the ITA erred when it used constructed value to find the Foreign Market Value of television sets produced by Sharp Corporation (Sharp). They contend that, after the ITA declined to use the prices submitted by Sharp, it should have used the evidence of the declared amounts on which Sharp paid the Japanese Commodity Tax on the television sets it sold in Japan.

The Court is of the opinion that, although the use of the commodity tax information would have been lawful and had much to recommend it,[7] the ITA was under no statutory obligation to use it.

The ITA apparently thought that if it had no direct evidence of prices in transactions for sale in the Japanese market, the statute would obligate it to turn immediately to sales to third countries or to constructed value. This belief was expressed at 42 Fed.Reg. 30164 ¶ 4. Although this understanding was wrong, it did not amount to harmful error in the administration of the law.

In reality, the ITA has the authority to go beyond direct evidence of relevant matters in appropriate situations. This is part of its inherent power to make these determinations so long as they are lawful and based on substantial evidence. Substantial evidence does not have to be perfect evidence. The ITA is even empowered to utilize information which might be less than satisfactory in normal situations. Thus, in 19 U.S.C. § 1677e(b) [8] the agencies

---

(C) the fact that merchandise described in paragraph (B) or (C) of section 771(16) [19 USC § 1677(16)(B) or (C)] is used in determining foreign market value,
then due allowance shall be made therefor.

**5.** 19 U.S.C. § 1677b(a)(2)
(2) Use of constructed value. If the administering authority determines that the foreign market value of imported merchandise cannot be determined under paragraph (1)(A), then, notwithstanding paragraph (1)(B), the foreign market value of the merchandise may be the constructed value of that merchandise, as determined under subsection (e).

**6.** 19 U.S.C. § 1677b(e)
**(e) Constructed value.** (1) Determination. For the purposes of this title, the constructed value of imported merchandise shall be the sum of—
(A) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise under consideration which would ordinarily permit the pro-

duction of that particular merchandise in the ordinary course of business;
(B) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, except that—
(i) the amount for general expenses shall not be less than 10 percent of the cost as defined in subparagraph (A), and
(ii) the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost; and
(C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise under consideration in condition, packed ready for shipment to the United States.

**7.** The Japanese Commodity Tax Law defines the taxable basis of the television sets in terms which are virtually identical to the terms of foreign market value.

**8.** 19 U.S.C. § 1677e(b)
**(b) Determinations to be made on best information available.** In making their determinations under this title, the administering authori-

are allowed to base their determinations on "the best information otherwise available" when a party refuses or is unable to produce information. By *a fortiori* reasoning they are certainly authorized to use secondary evidence of price (such as the commodity tax information) when direct evidence is not sufficient or usable.

Consequently, it is puzzling that the ITA did not utilize its authority to rely on good secondary evidence of price. It is even more bewildering to note that by turning to the complicated use of constructed value the ITA lost an opportunity to promote its administrative efficiency, a point which has recently been stressed as an important factor in the administration of this law. *Consumer Products Division, SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033 (Fed.Cir.1985). The use of the commodity tax information would have been markedly simpler than the use of constructed value.

Nevertheless, the failure to use a discretionary alternative form of proof for one type of valuation does not amount to error when the agency uses a lawful second means of valuation.

In short, if the ITA had seen fit to use the commodity tax information in the case of Sharp, its action would have been unassailable. Even though it displayed a curious restraint in the use of its discretion, it did not violate a requirement of the law by failing to use secondary evidence of price.

In sum, it can be said that the authority to use secondary sources of information is part of the power of the agency to use all reasonable ways and means to accomplish its task. 19 U.S.C. § 1673h [9] This authori-

ty does not create an obligation to turn to secondary sources before using an alternative statutory method of valuation.

For the producers other than Sharp, alternative information would not come into play if their actual prices were being properly used. For those producers the dispute centers on the use of their prices in sales to related parties in Japan and the general question of whether the relationship between parties was adequately investigated.

## II

Plaintiffs next turn to the foreign market value determinations made for the remaining Japanese producers of television sets. For those producers, direct proof of prices in the home market was found to be satisfactory.

Plaintiffs claim that the ITA did not eliminate the taint of relationship from the information used to determine Foreign Market Value. Plaintiffs argue that limiting the investigation of relationships to *financial* connections was improper. Zenith presented a scholarly argument that Japanese business relationships are governed by a tradition of conduct known as *keiretsu,* which produces coordinated action and the practical effects of relationship without the presence of equity connections.

The Court is of the opinion that the requirements of our law are satisfied when the ITA investigates whether there is any financial relationship between the producer and the purchaser in the home market. This goes to the essence of those relationships which the law details in 19 U.S.C. § 1677(13) [10] and which would obviously

---

ty and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

**9.** 19 U.S.C. § 1673h. **Duties of customs officers**
In the case of all imported merchandise of a class or kind as to which the administering authority has published an antidumping duty order under section 736 [19 U.S.C. § 1673e] under which entries have not been liquidated,

the appropriate customs officer shall, by all reasonable ways and means and consistently with the provisions of this title [19 U.S.C. §§ 1671 et seq.], ascertain and determine, or estimate, the foreign market value, the United States price, and any other information which the administering authority deems necessary for the purposes of administering this title [19 U.S.C. §§ 1671 et seq.].

**10.** 19 U.S.C. § 1677(13)
(13) Exporter. For the purpose of determining United States price, the term "exporter" includes the person by whom or for whose account the

tend to undermine the acceptability of a sale price. The question posed by the ITA was adequate to explore the full range of possible financial relationships involved in the enforcement of the law.

The discernment of relationships which do not find expression in concrete financial terms is not something which can be posited as a mandatory duty, and is not required of the ITA by law. In this case the ITA's determinations on the question of relationship were supported by substantial evidence and were in accordance with the law.

■ The plaintiffs have also challenged the validation of prices between related parties by means of prices to unrelated parties, claiming that the ITA did not determine that the volume of sales to unrelated parties was sufficient to serve as validation. However, this process of validation is not dependent on any fixed relative volume of sales. In the absence of any indication that the unrelated sales are arranged solely to validate the price to related parties, the ITA is within its authority to use such sales as are commercially significant.

The record shows that for Hitachi, Matsushita, and Mitsubishi, sales to unrelated parties were at prices identical to the prices to related purchasers. In the case of Sanyo, whose prices to unrelated purchasers were higher, the ITA used the higher prices and did not use the prices to related purchasers. For Toshiba, which sold only to related purchasers in Japan, the ITA compared its prices to those of manufacturers selling comparable television sets in arms-length transactions. This manner of proceeding accords with the law and its results are supported by substantial evidence.

As a final point on the subject of related parties, the plaintiffs claim that special verification should have been undertaken by the ITA after the matter became an issue in the proceeding. The Court does not believe that in the circumstances of this proceeding a duty arose to conduct a specific, additional verification of the relationship issue. In the opinion of the Court, the record before the ITA was sufficient to permit it to draw sound conclusions on the issue of relationships. This was not a case in which the verification duty was abdicated or violated to the point of eroding the legitimacy of the proceeding. *See, Al Tech Specialty Steel Corp. v. United States,* 6 CIT —— (Slip Op. 83–119), 575 F.Supp. 1277, *affirmed,* 745 F.2d 632 (Fed.Cir.1984).

### III

■ Plaintiffs' third area of disagreement with the determination involves the ITA's use of discounts and rebates to lower the foreign market value of television sets sold in Japan.

According to plaintiffs, if discounts and rebates are to enter into the calculation of foreign market value at all, it must be by means of deductions from *price* for those discounts and rebates that are *available to all purchasers.*

In the opinion of the Court this seemingly plausible claim has been precluded by the decision of our appellate court in *Smith-Corona Group Consumer Products Division, SCM Corp., v. United States,* 713 F.2d 1568 (C.A.F.C.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). In that opinion, the Court of Appeals for the Federal Circuit (CAFC) characterized the offer of a rebate

merchandise is imported into the United States if—

(A) such person is the agent or principal of the exporter, manufacturer, or producer;

(B) such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer;

(C) the exporter, manufacturer, or producer owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in any business conducted by such person; or

(D) any person or persons, jointly or severally, directly or indirectly, through stock ownership or control or otherwise, own or control in the aggregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer.

in Japan as a difference in the *circumstance of sale* in Japan as opposed to the sale in the United States. The CAFC further discussed rebates as increasing the effective cost to the manufacturer of the transactions under scrutiny. 713 F.2d at 1850. This means that to the extent that rebates and discounts are considered differences in circumstances of sale they are adjustments made for the exigencies of particular transactions under the authority of 19 U.S.C. § 1677b(a)(4).[11] As such, they do not have to meet the same requirements as would a "price," that is to say, they do not have to be given to *"all* purchasers." As items unrelated to price, rebates and discounts are not subject to the limitations on price of 19 U.S.C. § 1677b(a)(1)(A)[12] or 19 U.S.C. § 1677(14).[13]

Before the decision in *Smith Corona, supra,* the plain meaning of the law, the force of logic, and the teaching of analogous case law would have compelled the Court to reason as follows: Discounts and rebates are practices which relate directly to price. The law depends on the determination of a single price which must be the price available to *all* purchasers. If discounts and rebates are given to some purchasers and not to others they ought not to figure in the price. "All purchasers" cannot necessarily obtain the discounted price or the rebates, nor can "all purchasers" obtain any "average" price into which the discounts or rebates are averaged.

A correlary of this point would be that the authority of the agency to utilize techniques of averaging or sampling under 19 U.S.C. § 1677b(f)[14] could not justify the use of prices which are not available to all purchasers. This standard also has the advantage of immensely simplifying the administration of the law—a point which has come to figure prominently in analysis of administrative action in this area. *Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033 (Fed. Cir.1985).

At this time however, the holding of our appellate court has eliminated this line of reasoning. The claim by plaintiffs that discounts and rebates were improperly used in the calculation of foreign market value is rejected.

## IV

■ As a fourth issue Zenith has maintained its claim that the so-called exporter's sales price offset (the ESP offset) is erroneous as a matter of law. Zenith acknowledges that this issue was decided in *Smith Corona Group Consumer Products Division, SCM Corp. v. United States,* 713 F.2d 1568, *cert. denied,* — U.S. —, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). In that opinion, the Court of Appeals for the Federal Circuit stated that:

> Were it not for the exporter's sale price offset, comparisons based on purchase price would be fair, yet comparisons based on exporter's sales price would be skewed in favor of a higher dumping margin.

**11.** *See* Footnote 4, *supra.*

**12.** *See* Footnote 3, *supra.*

**13.** 19 U.S.C. § 1677(14)
Sold or, in the absence of sales, offered for sale. The term "sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
  (A) to all purchasers at wholesale, or
  (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
without regard to restrictions as to the disposition or use of the merchandise by the purchaser except that, where such restrictions are found to affect the market value of the merchandise,

adjustment shall be made therefor in calculating the price at which the merchandise is sold or offered for sale.

**14.** 19 U.S.C. § 1677b(f)
**(f) Authority to use sampling techniques and to disregard insignificant adjustments.**
For the purpose of determining foreign market value under this section, the administering authority may—
  (1) use averaging or generally recognized sampling techniques whenever a significant volume of sales is involved or a significant number of adjustments to prices is required, and
  (2) decline to take into account adjustments which are insignificant in relation to the price or value of the merchandise.

713 F.2d at 1578

The Appellate Court further stated that: In view of the discretion accorded the Secretary under the statute to make adjustments to foreign market value, we conclude that the exporter's sale price offset, 19 C.F.R. § 353.15(c) is a proper and reasonable exercise of the Secretary's authority to administer the statute fairly.

713 F.2d at 1579

It must be observed however that the result to which this Court is directed appears to nullify a fundamental statutory provision for determining United States price when the producer and the importer are related. In good conscience and with all due respect the Court must state that it does not see the unfairness which supposedly justifies the offset. This Court sees only a cancellation of an important part of the operation of the exporter's sales price method of finding a U.S. price. This amounts to a thwarting of Congressional intention.

The ITA evidently thinks that because selling expenses were extracted from the price of the first transaction inside the United States (as part of the technique of going back to what would be the true price in a transaction between the exporter and importer) there is something unfair in leaving selling expenses "inside" the price at which the exporter-producer sells to its customers in Japan. It therefore allows an equal amount to be deducted from that foreign market value in 19 C.F.R. § 353.-15(c).[15]

But this is nothing less than the nullification of the step specifically provided by law to help arrive at a fair price in related party transactions.

As noted earlier, the dumping margin in the United States is the amount by which the United States price is lower than the Foreign Market Value. When the United States price can't be obtained from the purchase price (the sale between the importer and exporter) because the parties are related, it has to be extracted from a later price (the sale from the related importer to an unrelated U.S. purchaser, i.e., the sale *after* importation). That price must be cleansed of the selling expenses of the importer in order to help arrive at what would be the real price between an exporter and an importer. This is essential to arriving at a fair U.S. Price, unaffected by special relationships. That is where the adjustment for selling expenses ought to stop. At that point the law has operated to bring the price found in the first U.S. transaction back to what it would be in an importation transaction. Then, both the purchase price (in the sale between unrelated importer and exporter) and the exporter's sales price (arrived at by the "extraction" method) are subject to adjustments which bring them further back to the equivalent of an ex-factory price in the home market for sales in exportation to the United States. At that point the operation of the alternative methods of finding a *U.S. Price* is complete and harmonious. Those prices may then be compared with the producers foreign market value in each instance to see whether the U.S. price is lower.

The ITA's creation of an "offset," does violence to this carefully worked-out statutory method. It disrupts the balanced statutory scheme and allows foreign market value to be unjustifiably reduced by selling expenses in the home market when the foreign market value is being used in a related party situation.

The Court is unable to see any unfairness resulting from the statutory method or any "skewing" in favor of higher dumping margins when it is used. In the related party situation the related exporter has no usable price to the U.S. until the exporter's

---

**15.** 19 C.F.R. § 353.15(c) (1980) provides:
(c) Special rule. Notwithstanding the criteria for adjustments for differences in circumstances of sale set forth in paragraphs (a) and (b) of this section,

* * * * * *

[i]n making comparisons using exporter's sales price reasonable allowance will be made for all actual selling expenses incurred in the home market up to the amount of the selling expenses incurred in the United States market. [Emphasis supplied.]

sales price method is applied. To say that a crucial element of its application is a "skewing" is nothing less than a straightforward disagreement with the plain meaning of the law, a judgment that exporter's sales price should not work the way it was intended to.

The removal of selling expenses from the U.S. side of the equation is essential to finding a fair U.S. price. The related exporter is told that its price is actually the next transaction price of its related importer, but only after those elements are removed which would not be in the exporter's price in a transaction with the importer. If that exporter is then allowed to deduct from his home market price an equivalent element of selling expenses the entire special statutory method is being negated. In short, the "offset" restores an element of one of the very items that Congress wanted to remove from U.S. Price in related party transactions.

To allow the ITA the discretion to promulgate rules which alter this method of statutory valuation, and to do so based on a misconception of what is fair, amounts to a grant of authority to freely amend the law. This result creates two foreign market values where *one* was intended, destroys the operation of exporter's sales price and represents the ultimate extension of discretion to the ITA.

In the shadow of these developments it becomes difficult to imagine what judicial control remains on the administration and interpretation of this law. It must be remembered that this entire administrative novelty has emerged from a regulation assertedly based on the authority to make adjustments due to "circumstances of sale." From this limited category of authority, intended only for proper adjustments to *foreign* market value, major surgery has been accomplished on the important statutory section dealing with the exporter's sales price method for determining a U.S. price.

With these comments in mind, the Court conforms to the ruling of the appellate court and rejects plaintiff's claim that the ESP offset is invalid.

V

The plaintiff unions have claimed that the ITA used a weighted average technique to determine U.S. price when it used the exporter's sale price method for Sharp. Obviously, a weighted average can eliminate dumping margins at one point in time by averaging in higher prices from a later time. That would clearly be unacceptable.

The government points out however, that the technique used weight averaging only within each entry, in a manner that did not alter the amount of the margin. The method is found acceptable by the Court insofar as its results do not differ from what would result from the sum of exporter's sales price for each selling price in each entry. In short, the Court is satisfied that the method did not conceal dumping margins and is in accordance with the law.

For the reasons expressed in this opinion the plaintiffs' motions for summary judgment must be, and hereby are, Denied. On the grounds expressed, the cross-motions for summary judgment are hereby Granted.

