KOYO SEIKO CO., LTD. and
Koyo Corporation of U.S.A.,
Plaintiffs–Appellants,

v.

The UNITED STATES and the United
States Department of Commerce,
Defendants–Appellees,

and

The Timken Company, Defendant.

No. 93–1517.

United States Court of Appeals,
Federal Circuit.

April 6, 1994.

See also 20 F.3d 1160.

Peter O. Suchman, Powell, Goldstein, Frazer & Murphy, Washington, DC, argued, for plaintiffs-appellants. With him on the brief, were Susan P. Strommer, T. George Davis, Jr. and Elizabeth C. Hafner.

Velta A. Melnbrencis, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued, for defendants-appellees. With her on the brief, were Frank

W. Hunger, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief, were Stephen J. Powell, Chief Counsel, Bernice A. Browne, Sr. Counsel, Linda S. Chang and Joan L. MacKenzie, Attorneys–Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel.

Terence P. Stewart, Stewart & Stewart, Washington, DC, argued, for defendant. With him on the brief, were James R. Cannon, Jr. and John M. Breen.

Before MAYER, MICHEL and RADER, Circuit Judges.

MICHEL, Circuit Judge.

Koyo Seiko Company and Koyo Corporation of U.S.A. (Koyo) appeal the June 1, 1993 decision of the Court of International Trade, slip opinion 93–87, 840 F.Supp. 136, denying Koyo's motion for judgment on the agency record. The court held that the International Trade Administration of the Department of Commerce (Commerce) was reasonable in refusing to consider averaging U.S. prices in the same manner that it averaged foreign market values when calculating Koyo's dumping margins for tapered roller bearings. Because Commerce did not abuse its discretion, we affirm.

## BACKGROUND

In the final results of its administrative review of tapered roller bearings less than four inches in diameter (TRBs) covering the period from August 1, 1988 through July 31, 1989, Commerce compared individual U.S. sales prices with an annual weighted-average foreign market value to determine Koyo's dumping margin. *Tapered Roller Bearings,* 56 Fed.Reg. 65,228 (Dep't Comm.1991) (final admin. review).[1] Commerce conducts an administrative review in order to redetermine the amount of antidumping duties assessed on imported merchandise. *See* 19 U.S.C. § 1675(a)(2) (1988). Before the Court of International Trade, Koyo challenged Commerce's decision not to use or even consider using an averaged U.S. price in the comparison.

The court held that Commerce's decision to use an annual weighted-average foreign market value was reasonable. Before averaging the foreign market value, Commerce compared the monthly weighted-average price to the annual weighted-average price and tested whether home market prices consistently rose or fell during the review period. Based on these two studies Commerce concluded that, because Koyo's home market prices were stable during the period of review, the annual weighted-average foreign market value was representative of home market prices. 56 Fed.Reg. at 65,230.

The Court of International Trade also held that Commerce was justified in not using an averaged U.S. price in the dumping margin calculations. The court first concluded that the relevant statute does not require Commerce to average both sides of the calculation. The court further concluded that Commerce's decision not to average U.S. sales prices was reasonable based on Commerce's statement that since the TRBs are "not a perishable product, and our tests of home market sales revealed that there are no significant price fluctuations, there is no reason to believe that averaging of U.S. prices is needed to account for very significant price fluctuations." 56 Fed.Reg. at 65,231. Hence, no error of law was discerned and no error of fact was asserted.

Koyo appealed the court's decision that Commerce could properly refuse to consider averaging U.S. prices in this case. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## STANDARD OF REVIEW

■ The standard of review for an antidumping duty determination is specified in 19 U.S.C. § 1516a(b)(1)(B) which requires the Court of International Trade to find the determination unlawful if it is unsupported by substantial evidence or otherwise not in accordance with law. The same standard applies to our review of the agency's antidumping duty determination. *PPG Indus.,*

---

1. Timken petitioned for the administrative review and is a defendant.

*Inc. v. United States,* 978 F.2d 1232, 1236 (Fed.Cir.1992).

## ANALYSIS

■ The statutory scheme grants discretion to Commerce in deciding when to average prices. 19 U.S.C. § 1677f–1 states that when calculating the U.S. sales price *or* the foreign market value, Commerce *may* use averages representative of the transaction:

(a) For the purpose of determining United States price *or* foreign market value under sections 1677a and 1677b of this title, and for purposes of carrying out annual reviews under section 1675 of this title, the administering authority *may*—

(1) use averaging or generally recognized sampling techniques whenever a significant volume of sales is involved *or* a significant number of adjustments to prices is required....

(b) The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the *transactions* under investigation.

19 U.S.C. § 1677f–1 (1988) (emphasis added).

Koyo concedes that this statute gives no indication that Commerce must average both sides of the dumping margin equation. However, Koyo argues that Commerce abused its discretion by not analyzing whether the comparison of an averaged foreign market value and individual U.S. prices resulted in a representative margin. Koyo relies on a case from the Court of International Trade, *Floral Trade Council of Davis, Cal. v. United States,* 704 F.Supp. 233, 238 (Ct. Int'l Trade 1988), for the proposition that 19 U.S.C. § 1677f–1 requires dumping margins to be representative. According to Koyo, one of the goals of the statute is to ensure that the antidumping duty calculations be made "on a fair basis" which requires an "apples to apples" comparison, citing *Smith–Corona Group v. United States,* 713 F.2d 1568, 1578, 1 Fed.Cir. (T) 130, 140 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

Koyo further argues that the comparison of individual U.S. prices with an averaged foreign market value can generate inherently unrepresentative margin calculations. A dumping margin results each time an individual U.S. price drops below the averaged foreign market value even though a comparison of averaged U.S. prices and averaged foreign market values may not generate a margin. For this reason, Koyo maintains that a dumping margin calculated from an individual U.S. price and an averaged foreign value may be unrepresentative of the true situation.

■ First, we disagree that 19 U.S.C. § 1677f–1(b) requires that margins be representative when it states the "averages shall be representative of the transactions under investigation." The "transactions under investigation" are the sales in the home market and the U.S., not the dumping margins resulting from a comparison of the two. The words of the statute make this clear since only those sales and not a margin could be represented by "such samples and averages." Thus, the statute does not require that Commerce determine whether the comparison of an averaged foreign market value and individual U.S. prices results in a representative dumping margin. *Floral Trade* overlooks this fact.

Secondly, *Smith–Corona Group* does not support Koyo's contention. Smith–Corona, a U.S. manufacturer of typewriters, challenged adjustments, not expressly authorized by the relevant statute, that Commerce had made to the foreign market value of imported typewriters. The statute, 19 U.S.C. § 1677a(e), provided for adjustment of the exporter's sales price for certain indirect costs such as selling expenses. Commerce perceived that the U.S. price based on the exporter's sales price was distorted by the adjustment for indirect costs and, therefore, promulgated a regulation to allow a similar adjustment to foreign market value. *Smith–Corona Group,* 713 F.2d at 1578, 1 Fed.Cir. (T) at 139.

In upholding the regulation providing for the adjustment we stated, "One of the goals of the statute is to guarantee that the administering authority makes the fair value comparison on a fair basis—comparing apples with apples.... [The statute] expressly requires a fair comparison. The offset is an attempt to achieve such a comparison." *Id.* A central rationale for upholding the regula-

tion rested on Commerce's discretion: "In view of the discretion accorded the Secretary under the statute to make adjustments to foreign market value, we conclude that [the offset] is a proper and reasonable exercise of the Secretary's authority to administer the statute fairly." *Id.* at 1579, 1 Fed.Cir. (T) at 141.

*Smith–Corona Group* does not stand for the proposition that U.S. prices and foreign market value must be treated in a similar manner when calculating a dumping margin. Rather, that case recognizes Commerce's discretion in calculating dumping margins and allows exercise of that discretion to achieve a fair result. In contrast, Koyo requests that we limit Commerce's discretion.

■ Furthermore, Commerce is exercising its discretion to achieve a fair result here. The purpose of the antidumping statute is to protect domestic manufacturing against foreign manufacturers who sell at less than fair market value. *Id.* at 1575–76, 1 Fed.Cir. (T) at 137. Averaging U.S. prices defeats this purpose by allowing foreign manufacturers to offset sales made at less-than-fair value with higher priced sales. Commerce refers to this practice as "masked dumping." By using individual U.S. prices in calculating dumping margins, Commerce is able to identify a merchant who dumps the product intermittently—sometimes selling below the foreign market value and sometimes selling above it. We cannot say that this is an unfair or unreasonable result. *See Zenith Radio Corp. v. United States,* 606 F.Supp. 695, 703 (Ct. Int'l Trade 1985) (stating that a weighted-average United States price is unacceptable when it "can eliminate dumping margins at one point in time by averaging in higher prices from a later time"), *aff'd,* 783 F.2d 184, 4 Fed.Cir. (T) 44 (Fed.Cir.1986).

■ Commerce averages U.S. prices only under special circumstances involving perishable products like cut flowers. In such a case, the merchant will sometimes sell a product at an unusually low price if it is about to become unsalable. The low price, which reflects necessity rather than unfair competition, would not be representative of the price at which the product is generally sold in the U.S., so Commerce may use an average. *See Floral Trade Council of Davis, Cal. v. United States,* 775 F.Supp. 1492, 1498 (Ct. Int'l Trade 1991). Because TRBs are not perishable and subject to distress sales, Commerce properly followed its long-established practice of not averaging the U.S. price.

■ Finally, Congress intended Commerce's calculation of dumping margins to reflect individual sales in the U.S. as opposed to an average of all sales during a review period. The statute directs Commerce to compare "the foreign market value and United States price *of each entry* of merchandise subject to the antidumping duty order and included within that determination." 19 U.S.C. § 1675(a)(2)(A) (1988) (emphasis added). In the process, Commerce must calculate dumping margins based upon the "amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry." 19 U.S.C. § 1675(a)(2)(B). For this reason also, we cannot say that Commerce abused its discretion by refusing to consider averaging U.S. prices.

### CONCLUSION

19 U.S.C. § 1677f grants Commerce discretion in deciding when to average either foreign market values or U.S. prices in calculating dumping margins. Because Commerce did not abuse its discretion by using a weighted-average foreign market value without considering whether to average U.S. prices for a nonperishable product, the decision of the Court of International Trade is

*AFFIRMED.*