# United States Court of Appeals for the Federal Circuit

---

**APEX FROZEN FOODS PRIVATE LIMITED, ASVINI FISHERIES PRIVATE LIMITED, AVANTI FEEDS LIMITED, BLUE PARK SEAFOODS PRIVATE LIMITED, DEVI MARINE FOOD EXPORTS PRIVATE LTD., KADER EXPORTS PRIVATE LIMITED, KADER INVESTMENT AND COMPANY PRIVATE LIMITED, LIBERTY FROZEN FOODS PVT. LTD., LIBERTY OIL MILLS LTD., PREMIER MARINE TRADING PRODUCTS, UNIVERSAL COLD STORAGE PRIVATE LIMITED, FIVE STAR MARINE EXPORTS PRIVATE LIMITED, GVR EXPORTS PRIVATE LIMITED, JAGADISH MARINE EXPORTS, JAYALAKSHMI SEA FOODS PRIVATE LIMITED, NEKKANTI SEAFOODS LIMITED, SAGAR GRANDHI EXPORTS PRIVATE LIMITED, SAI MARINE EXPORTS PRIVATE LIMITED, SAI SEA FOODS, SANDHYA MARINES LIMITED, SPRINT EXPORTS PRIVATE LIMITED, STAR AGRO MARINE EXPORTS PRIVATE LIMITED, SURYA MITRA EXIM PRIVATE LIMITED, WELLCOME FISHERIES LIMITED,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, AD HOC SHRIMP TRADE ACTION COMMITTEE, AMERICAN SHRIMP PROCESSORS ASSOCIATION,**
*Defendants-Appellees*

————————————

2015-2085

————————————

Appeal from the United States Court of International Trade in No. 1:13-cv-00283-RWG, Senior Judge Richard W. Goldberg.

————————————

Decided: July 12, 2017

————————————

ROBERT L. LAFRANKIE, Crowell & Moring, LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by MATTHEW R. NICELY, Hughes Hubbard & Reed LLP, Washington, DC.

JOSHUA E. KURLAND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, PATRICIA M. MCCARTHY; SCOTT DANIEL MCBRIDE, HENRY JOSEPH LOYER, United States Department of Commerce, Washington, DC.

PHILIP ANDREW BUTLER, Stewart & Stewart, Washington, DC, argued for defendant-appellee American Shrimp Processors Association. Also represented by ELIZABETH DRAKE, TERENCE PATRICK STEWART, WILLIAM ALFRED FENNELL; EDWARD T. HAYES, Leake & Andersson, L.L.P., New Orleans, LA.

NATHANIEL RICKARD, Picard Kentz & Rowe LLP, Washington, DC, for defendant-appellee Ad Hoc Shrimp Trade Action Committee. Also represented by ROOP BHATTI, DAVID ALBERT YOCIS, WHITNEY MARIE ROLIG.

————————————

Before NEWMAN, CLEVENGER, and TARANTO, *Circuit Judge*s.

CLEVENGER, *Circuit Judge.*

Plaintiffs appeal the decision of the Court of International Trade ("CIT") affirming the U.S. Department of Commerce's ("Commerce") final results in the seventh administrative review of the antidumping duty order on certain frozen warmwater shrimp from India. *Apex Frozen Foods Private Ltd. v. United States* (*Apex I*), 37 F. Supp. 3d 1286, 1289 (Ct. Int'l Trade 2014); *see also Certain Frozen Warmwater Shrimp from India*, 78 Fed. Reg. 42,492 (Dep't Commerce July 16, 2013) (final administrative review). Using the "average-to-transaction" methodology with zeroing, Commerce assessed mandatory respondent Apex Frozen Foods Private Ltd. ("Apex") and other non-mandatory respondents (included in this appeal) with a 3.49 percent duty for entries between February 1, 2011, and January 31, 2012.

Apex and the additional plaintiffs (collectively, "Apex") challenge the methodology used by Commerce to calculate the antidumping duty on a number of grounds related to Commerce's decision to use the average-to-transaction methodology and zeroing. For the reasons that follow, we affirm the CIT's decision and sustain Commerce's results.

BACKGROUND

I

"Dumping," in international trade parlance, is a practice where international exporters sell goods to the United States at prices lower than they are sold in their home markets, in order to undercut U.S. domestic sellers and carve out market share. To protect domestic industries from goods sold at less than "fair value," Congress enacted a statute allowing Commerce to assess remedial "anti-

dumping duties" on foreign exports.  19 U.S.C. § 1673; *see also Viet I-Mei Frozen Foods Co. v. United States*, 839 F.3d 1099, 1101 (Fed. Cir. 2016) ("The antidumping statute provides for the assessment of remedial duties on foreign merchandise sold in the United States at less than fair market value that materially injures or threatens to injure a domestic industry.").

"Sales at less than fair value are those sales for which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) . . . ." *Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013).  Commerce performs this pricing comparison, and the concomitant antidumping duty calculation, using one of three methodologies:

> (1) Average-to-transaction ["A-T"], in which Commerce compares the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions.

> (2) Average-to-average ["A-A"], in which Commerce compares the weighted average of the normal values to the weighted average of the export prices (or constructed export prices).

> (3) Transaction-to-transaction ["T-T"], in which Commerce compares the normal value of an individual transaction to the export price (or constructed export price) of an individual transaction.

*Id.* (citation omitted).

Previously, Commerce's general practice was to use the A-T methodology for both investigations and administrative reviews.  *Id.* at 1104.  With the adoption of the Uruguay Rounds Agreement Act in 1995, Congress required that the A-A or T-T methods be the presumed defaults *for investigations*, with the A-T method only to be used in certain circumstances.  *Id.*; *see also* 19 U.S.C.

§ 1677f-1(d)(1).  Yet "Commerce continued to use average-to-transaction comparisons as its general practice in administrative reviews," in the absence of any governing statutory authority. *Union Steel*, 713 F.3d at 1104.  Over time, Commerce unified its procedures through regulation, stating, "[i]n an investigation or review, the Secretary will use the average-to-average method unless the Secretary determines another method is appropriate in a particular case," 19 C.F.R. § 351.414(c)(1) (2012), and began applying the investigations statutory framework to guide its administrative reviews as well.

The investigations statute provides that, in general, antidumping duties are to be calculated using the A-A method—"comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise."[1] 19 U.S.C. § 1677f-1(d)(1)(A)(i).  The statute, however, contemplates an exception to this general rule:

> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—
>
> > (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

---

[1]    The statute also supports using the T-T method, but the parties are in agreement that the T-T method is not at issue here.  19 U.S.C. § 1677f-1(d)(1)(A)(ii).

> (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

19 U.S.C. § 1677f-1(d)(1)(B).   In other words, the A-T method can be used, provided two preconditions are met: (1) a pattern of significant price differences, and (2) an inability of the A-A method to "account" for these differences.

The statutory exception exists to address "targeted" or "masked" dumping.  *Union Steel*, 713 F.3d at 1104 n.3. Under the A-A methodology, sales of low-priced "dumped" merchandise would be averaged with (and offset by) sales of higher-priced "masking" merchandise, giving the impression that no dumping was taking place and frustrating the antidumping statute's purpose.  *See Koyo Seiko Co. v. United States*, 20 F.3d 1156, 1159 (Fed. Cir. 1994). The A-T method addresses this concern because, "[b]y using individual U.S. prices in calculating dumping margins, Commerce is able to identify a merchant who dumps the product intermittently—sometimes selling below the foreign market value and sometimes selling above it." *Id.*  The driving rationale behind the statutory exception is that targeted dumping is more likely to be occurring where there is a "pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time."  *See* 19 U.S.C. § 1677f-1(d)(1)(B); *Union Steel*, 713 F.3d at 1104 n.3; *see also* H.R. Rep. No. 103-826, pt. 1, at 99 (1994) ("[The exception] provides for a comparison of average normal values to individual export prices . . . in situations where an average-to-average . . . methodology cannot account for a pattern of prices that differ significantly among purchasers, regions, or time periods, *i.e.*, where targeted dumping may be occurring.").

Commerce also devised the practice of "zeroing" when compiling a weighted average dumping margin—"where negative dumping margins (i.e., margins of sales of merchandise sold at nondumped prices) are given a value of zero and only positive dumping margins (i.e., margins for sales of merchandise sold at dumped prices) are aggregated." *Union Steel*, 713 F.3d at 1104. Commerce has discontinued its use of zeroing when applying the A-A methodology, but zeroing remains part of Commerce's calculus when compiling a weighted average dumping margin under the A-T methodology. *Id.* at 1104–05, 1109 ("Commerce's decision to use or not use the zeroing methodology reasonably reflects unique goals in differing comparison methodologies. . . . When examining individual export transactions, using the average-to-transaction comparison methodology, prices are not averaged and zeroing reveals masked dumping."); *see also U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1363 (Fed. Cir. 2010).

## II

Commerce initiated the seventh administrative review of its antidumping duty covering frozen warmwater shrimp from India ("AR7") in April 2012—the review period covered entries of merchandise that occurred between February 1, 2011, and January 31, 2012. Commerce selected Apex and Devi Fisheries Limited ("Devi") as mandatory respondents. Commerce also individually reviewed Falcon Marine Exports Limited/K.R. Enterprises ("Falcon") as a voluntary respondent. *See* 19 U.S.C. § 1677m(a) (permitting exporters not selected for mandatory individual review to volunteer to have an "individual weighted average dumping margin" calculated, if not unduly burdensome).

During the course of AR7, the American Shrimp Processors Association ("ASPA"), a domestic "interested party," *see* 19 U.S.C. § 1677(9), alleged that Apex was

engaged in targeted dumping during the review period. ASPA requested that Commerce apply the A-T methodology with zeroing when reviewing the antidumping duty.

Commerce published the final results of AR7 in July 2013, along with an Issues and Decision Memorandum explaining its methodology and results. Commerce noted that, despite the statutory silence on what methodology to apply in the administrative review context, "it would look to practices employed by the agency in antidumping investigations for guidance on this issue." Joint Appendix at 886. As such, following 19 U.S.C. § 1677f-1(d)(1)(B), Commerce considered (1) whether Apex's, Devi's, and Falcon's sales exhibited a pattern of significant price differences among purchasers, regions, or periods of time; and (2) whether "such differences can be taken into account using" the A-A method.

Applying a court-sanctioned methodology known as the *Nails* test, *see Mid Continent Nail Corp. v. United States*, 712 F. Supp. 2d 1370, 1376–79 (Ct. Int'l Trade 2010), Commerce identified for Apex a pattern of targeted sales that differed significantly from prices of non-targeted sales.[2] For Devi and Falcon, Commerce conclud-

---

[2]    Because the parties do not dispute the use and results of the *Nails* test, we need not delve too deeply into the technical intricacies of the test. In short, first, the *Nails* test identifies, within an allegedly targeted group, the sales made "at prices more than one standard deviation below the weighted-average price of all sales under review." Joint Appendix at 888. Second, assuming a threshold portion of the allegedly targeted sales satisfy this "standard deviation test," Commerce assesses the "the total volume of sales for which the difference between the weighted-average price of sales for the allegedly targeted group and the next higher weighted average price of sales for a non-targeted groups exceeds the aver-

ed there was an "insufficient volume of sales" to justify applying the exception, and therefore used the standard A-A methodology.  Joint Appendix at 884.

Commerce also determined that the A-A method could not "account" for the pattern of price differences in Apex's sales because it observed a "meaningful difference in the weighted-average dumping margins calculated using the A-to-A method and the A-to-T method."  *Id.*; *see also id.* at 889 ("Where there is a meaningful difference between the results of the A-to-A method and the A-to-T method, the A-to-A method would not be able to take into account the observed price differences, and the A-to-T method would be used to calculate the weighted-average margin of dumping for the respondent in question.").  Specifically, Commerce found that "Apex's margin is zero using the A-to-A method and 3.49 percent using the A-to-T method," and "concluded that . . . such a difference is meaningful because it crosses the *de minimis* threshold and warrants the application of the A-to-T method."  *Id.* at 889.

Consequently, Commerce assessed Apex's entries with a 3.49 percent antidumping duty, calculated using the A-T methodology.  For Devi and Falcon, Commerce applied the A-A methodology, which resulted in *de minimis* antidumping rates (less than 0.5 percent); therefore, Devi's and Falcon's entries were not assessed with an antidumping duty.  Exporters not selected for individual review were assigned the same 3.49 percent duty as Apex.

Apex filed suit at the CIT, challenging Commerce's final results.  On December 1, 2014, the CIT rejected

---

age price gap (weighted by sales volume) between the non-targeted groups."  *Id.*  If a threshold volume of sales are found to pass this "gap test," Commerce concludes that "targeting occurred and these sales passed the *Nails* test."  *Id.*

Apex's claims and sustained the results of AR7 in full. *Apex I*, 37 F. Supp. 3d 1286. Apex filed a motion to amend the judgment, which the CIT denied on July 27, 2015. *Apex Frozen Foods Private Ltd. v. United States* (*Apex II*), No. 13-00283, 2015 WL 4646543 (Ct. Int'l Trade 2015).

On appeal to this court, Apex objects to Commerce's use of the A-T methodology because Commerce failed explain why the A-A methodology could not "account" for the observed targeting. Additionally, even assuming it was appropriate to use the A-T methodology, Apex objects to Commerce's actual calculation of the antidumping rate.

We have jurisdiction under 28 U.S.C § 1295(a)(5).

STANDARD OF REVIEW

We review Commerce's actions using the same standard applied by the CIT. *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1349 (Fed. Cir. 2015). As such, we will sustain the agency's decisions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Notwithstanding the CIT's "unique and specialized expertise in trade law," we review its decision *de novo*. *Union Steel*, 713 F.3d at 1106; *see also Novosteel SA v. United States*, 284 F.3d 1261, 1269 (Fed. Cir. 2002) ("[W]e also give due respect to the informed opinion of the [CIT]." (internal quotation marks omitted)).

Our review of an agency's interpretation and implementation of a statutory scheme is governed by the Supreme Court's holding in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*'s two-part framework, we first ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If yes, "that is the end of the matter," and we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. But, "if

the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843; *see also Koyo Seiko*, 36 F.3d at 1573 ("In a situation where Congress has not provided clear guidance on an issue, *Chevron* requires us to defer to the agency's interpretation of its own statute as long as that interpretation is reasonable.").

## DISCUSSION

Apex contends that Commerce unlawfully applied the A-T methodology because it failed to adequately explain why the price differences identified by the *Nails* test could not be "taken into account" using the A-A method, as required by statute. *See* 19 U.S.C. § 1677f-1(d)(1)(B)(ii). Additionally, assuming it was proper to use the A-T methodology to some extent, Apex objects to Commerce's application of the methodology and the ultimate anti-dumping duty calculation. We address Apex's arguments in turn.

## I

Apex claims that Commerce failed to adhere to the statute's requirement that "the administering authority explains why such differences cannot be taken into account using" the A-A methodology. 19 U.S.C. § 1677f-1(d)(1)(B)(ii).[3] As noted above, Commerce's justification for why the A-A methodology was inadequate to account for the price differences was based on its "meaningful

---

[3] "[S]uch differences" refers to the other statutory precondition for using the A-T methodology, which requires that there be a pattern of significant price differences "among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B)(i). Apex does not challenge Commerce's use of the *Nails* test or the results showing that a pattern of "such differences" existed.

difference" test, which simply compared the ultimate antidumping duties that would be applied under the A-A methodology versus the A-T methodology. Because the margin "crosse[d] the *de minimis* threshold"—going from below 0.5 percent for the A-A methodology to above 0.5 percent for the A-T methodology—Commerce concluded that there was a meaningful difference between the rates and that use of the A-T methodology was warranted. Joint Appendix at 889.

Apex takes issue with several aspects of Commerce's meaningful difference test as a mechanism for satisfying the statute.

## A

First, Apex argues that the uneven application of zeroing—which is used for the A-T methodology but not for the A-A methodology—prevented Commerce's meaningful difference test from truly measuring the targeted price differences. In other words, Apex maintains that the difference between the ultimate antidumping duties under either methodology (0.0 percent for A-A; 3.49 percent for A-T) merely illustrated the distortive effects of zeroing, not the targeted sales, which are the focus of the statute. Instead, Apex argues "Commerce must use an 'apples-to-apples' comparison under its 'meaningful difference' analysis"—either applying zeroing for both methodologies or neither. Apex Opening Brief at 32. Notwithstanding the fact that, in practice, the A-A and A-T methodologies do apply zeroing differently, Apex contends that the meaningful difference test goes to the threshold question of whether using the A-T methodology is appropriate, and therefore the analysis should be different from the ultimate remedy calculation. *Id.* at 31 ("Commerce unreasonably zeroes as part of its *threshold* calculation to determine whether it may zero later in its *remedy* calculation. In other words, *Commerce uses zeroing to justify zeroing*.").

To address Apex's complaint, we look first to the statute, which only requires Commerce to explain why targeted price differences "cannot be taken into account using" the A-A methodology. 19 U.S.C. § 1677f-1(d)(1)(B)(ii). Congress gave no indication of how Commerce is to perform this analysis or even what it means for the A-A methodology to take "account" of targeting. Faced with this statutory silence, we ask whether Commerce's exercise of its gap-filling authority and its explanation are reasonable.[4] *Chevron*, 467 U.S. at 843–44.

We agree with the CIT that Commerce's decision to compare a zeroed A-T rate with a non-zeroed A-A rate reasonably achieved the statutory goal of determining whether the A-A method could account for targeting. Nothing in the statute demands inventing a two-part analysis as Apex suggests—one calculation for the meaningful difference test and a different calculation for the ultimate remedy. As the CIT pointed out, the statute "does not compel Commerce to conduct a meaningful difference analysis at all." *Apex I*, 37 F. Supp. 3d at 1295. Therefore, it was reasonable for Commerce to compare the antidumping rates as they would ultimately be applied,

---

[4]   We also note, again, that the statutory framework of 19 U.S.C. § 1677f-1(d)(1), by its terms, only applies to Commerce's investigations, and not administrative reviews. Indeed, § 1677f-1(d)(2) specifically contemplates the continued use of the A-T methodology in reviews, without elaborating on the appropriate circumstances for doing so. As such, although Commerce has elected to follow the investigations framework for its reviews as well, we will defer to a reasonable agency interpretation, given that Congress did not enact the statute to deal with the issue we face. *See Chevron*, 467 U.S. at 842 ("First, always, is the question whether Congress has directly spoken to the precise question at issue.").

with zeroing for the A-T methodology and without zeroing for the A-A methodology, rather than with Apex's fictional "apples-to-apples" approach. We have previously held:

> Commerce's decision to use or not use the zeroing methodology reasonably reflects unique goals in differing comparison methodologies. In average-to-average comparisons, . . . Commerce examines average export prices; zeroing is not necessary because high prices offset low prices within each averaging group. When examining individual export transactions, using the average-to-transaction comparison methodology, prices are not averaged and zeroing reveals masked dumping. This ensures the amount of antidumping duties assessed better reflect the results of each average-to-transaction comparison. Commerce's differing interpretation is reasonable because the comparison methodologies compute dumping margins in different ways and are used for different reasons.

*Union Steel*, 713 F.3d at 1109 (footnote omitted). Given that the statutory exception permitting the use of the A-T methodology exists specifically to address targeted dumping that may otherwise be hidden, we agree with the CIT that Commerce's comparison method—which reveals the full extent of dumping—"fulfills the statute's aim and deserves deference." *Apex I*, 37 F. Supp. 3d at 1296.

While Commerce's methodology may indeed be "results-oriented," we cannot say that it preordains the use of the A-T methodology or that it is unreasonable. Apex's submitted approach may offer another reasonable alternative, but "[w]hen a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests,' Commerce 'may perform its duties in the way it believes most suitable.'" *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96

F.3d 1352, 1362 (Fed. Cir. 1996)). Therefore, we conclude that Commerce's decision to compare the A-T rates with zeroing to the A-A rates without zeroing in its meaningful difference analysis is reasonable and in accordance with the statute.

B

Second, Apex argues that, during its meaningful difference analysis, Commerce improperly compared the A-A and A-T rates across all of Apex's sales, instead of only the subset of targeted sales that passed the *Nails* test. Apex contends that comparing the A-A and A-T rates using the entirety of Apex's sales—supposedly revealing the full scope of dumped sales—fails to get to the heart of the statutory question, which is whether the A-A methodology can account for dumping resulting from *targeted sales*. Apex Opening Brief at 34 ("[T]he lower court failed to take the next logical step of determining whether Commerce also reasonably explained why A-A 'cannot account for dumping *from targeting sales*' . . . .").

On appeal, Apex attempts to package this argument together with its objection to Commerce's uneven application of zeroing. The CIT, however, found that Apex's position was never exhausted before the agency and declined to consider it on the merits. *Apex I*, 37 F. Supp. 3d at 1296–98. In particular, in *Apex I*, the CIT determined that Apex had only challenged the meaningful difference test on the ground that it "measured mostly the impact of zeroing," not that it focused primarily on "untargeted" dumping. *Id.* And even though Apex had challenged the ultimate antidumping calculation for using all sales, the CIT determined that Commerce "would not naturally infer from an argument made at the remedy step that a conclusion made at [the meaningful difference step] was wrong." *Id.* at 1298. In *Apex II*, addressing Apex's motion to amend, the CIT maintained its finding that the argument was not exhausted. *Apex II*,

2015 WL 4646543, at *7 ("Plaintiffs say it was unreasonable to apply A-T because the meaningful difference test did not distinguish between targeted and untargeted sales. . . . After scouring the case briefs and trial briefs, the court cannot find this high-level, legal version of the argument mentioned anywhere, except in the reply.").

"[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "[T]he application of exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade." *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (internal quotation marks omitted). We therefore review the CIT's failure to exhaust determination for an abuse of discretion.

In both *Apex I* and *Apex II*, the CIT justified its refusal to consider Apex's argument at length, explaining that Apex had only ever previously criticized the meaningful difference analysis for its disparate use of zeroing in comparing the A-A and A-T rates. *Apex I*, 37 F. Supp. 3d 1296–98; *Apex II*, 2015 WL 4646543, at *3–5, *7. The CIT reasoned that Apex's new position—that looking at all sales in the meaningful difference test says nothing about whether the A-A method can account for targeting specifically—was an entirely distinct, non-exhausted argument. We see no evidence that the CIT abused its discretion in reaching this conclusion.

Apex maintains that it provided "at least a suggestion" of its arguments to Commerce, sufficient to satisfy its exhaustion requirements and showing that the CIT abused its discretion. Apex Opening Brief at 37–38 (citing *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1259 (Fed. Cir. 2009)). We agree with the CIT that Apex misinterprets the holding of *Ningbo*. *Apex II*, 2015 WL 4646543, at *5. There, this court was confronted with the inverse scenario: the CIT had, in the first in-

stance, found a party's argument to be exhausted because the record contained a "suggestion" of the argument, and because Commerce had an opportunity to address it. *Ningbo*, 580 F.3d at 1259. This court reasoned that the CIT's ruling was not an abuse of discretion. *Id.*

By contrast, here the CIT reached the opposite conclusion, finding Commerce did not have a meaningful opportunity to address Apex's untargeted sales argument. *See Apex I*, 37 F. Supp. 3d at 1297 ("[The exhaustion] rule gives the agency the opportunity to correct its own mistakes, including fact-specific shortfalls in its analysis, before it is haled into federal court. Commerce had no such opportunity to correct the alleged flaw in its meaningful difference finding." (internal citations and quotation marks omitted)). Apex has not given a reason for its belief that the CIT abused its discretion, and we can see none. Therefore, we similarly decline to address the merits of Apex's argument that Commerce's meaningful difference test was flawed because it should have calculated and compared A-A and A-T rates for only those sales that passed the *Nails* test, *i.e.*, targeted sales.[5]

## C

In its final challenge to the meaningful difference test, Apex argues that Commerce's *de minimis* benchmark is arbitrary and unreasonable. Apex contends that Com-

---

[5] The plaintiffs in the parallel action challenging the results of Commerce's eighth administrative review of its antidumping duty covering frozen warmwater shrimp from India ("AR8") raise a similar objection to Commerce's meaningful difference test. Our review of AR8, issued concurrently, provides a discussion of the merits of this argument. *See Apex Frozen Foods Private Ltd. v. United States*, No. 16-1789, slip op. at 13–18 (Fed. Cir. July 12, 2017).

merce failed to explain why crossing the *de minimis* threshold—going from an antidumping rate below 0.5 percent to a rate above 0.5 percent—was "meaningful."

We disagree. By regulation, Commerce treats antidumping duties that are less than 0.5 percent as *de minimis—i.e.*, subject merchandise is not assessed with any antidumping duty if an administrative review yields a weighted-average dumping margin of 0.5 percent or less. 19 C.F.R. § 351.106(c)(1)–(2).[6] As explained by the CIT, "the agency does not impose duties at all if it finds that an exporter's rate is less than or equal to 0.5 percent. The threshold is small by design, because reviews aim to counteract as much dumping behavior as possible." *Apex I*, 37 F. Supp. 3d at 1299 (internal quotation marks omitted).

Using the A-A methodology, Commerce calculated a weighted-average antidumping margin of 0.0 percent. Under the A-T methodology, Commerce calculated a weighted-average antidumping margin of 3.49 percent. In other words, application of the A-T methodology would yield at least some antidumping duty, thereby counteracting any targeted dumping, whereas the A-A methodology "would yield none." *Apex I*, 37 F. Supp. 3d at 1299. We cannot say that Commerce's conclusion that such a difference is meaningful was unreasonable

---

[6] Apex complains that Commerce never explicitly pointed to 19 C.F.R. § 351.106(c) as the basis for its meaningfulness determination. Such a complaint lacks merit. Commerce specifically mentioned the "*de minimis* threshold" to support its conclusion that the rates were meaningfully different in its Issues and Decision Memorandum, and its final results did, in fact, cite 19 C.F.R. § 351.106(c). Joint Appendix at 889, 904.

Apex maintains that Commerce's approach is unreasonable because any difference that crosses the *de minimis* threshold, "regardless of the amount of the change in the margin," would be found to be meaningful. Apex Opening Brief at 40 ("This arbitrary one-size fits all approach is neither reasonable, nor contemplated by the statute."). Whereas this challenge may have some weight were we faced with different facts, Apex's argument ignores the realities of the case before us, where there is no question that substantial evidence supports Commerce's meaningful difference determination. *See Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071 (Fed. Cir. 2001) ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal quotation marks omitted)). Apex's argument also ignores the fact that Commerce explicitly stated that its meaningfulness analysis was to be "decided on a case-by-case basis." Joint Appendix at 889. In other words, it is not necessarily the case that *any* comparison yielding rates crossing the *de minimis* threshold would be considered meaningful. Apex's contention that Commerce would blindly find a meaningful difference without considering the magnitude of change is not supported.

Consequently, we agree with the CIT that Commerce's *de minimis* benchmark was a reasonable basis for illustrating a meaningful difference between the A-A and A-T rates. Moreover, Apex has not shown that Commerce's analysis—regarding whether the A-A methodology could account for targeted price differences—was unreasonable.

## II

Apex next argues that, even if the statutory scheme were satisfied and it were appropriate to apply the A-T methodology in theory, Commerce's calculation of the ultimate antidumping margin was flawed. Apex's chal-

lenges to the calculation closely parallel its complaints above.

A

First, Apex argues that the A-T methodology only should have been applied to the targeted sales—*i.e.*, those sales passing the *Nails* test. Apex argues the traditional A-A methodology should have been used for all other sales. Apex again looks to the text of the statute, which permits the use of the A-T methodology where the A-A methodology cannot otherwise account for the targeted sales. Apex's position is that Congress only intended for the A-T methodology to be used as a substitute for *those sales,* but not all sales.

We disagree that the statutory text decides the issue. Once more, the exception reads:

> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—
>
> > (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
> >
> > (ii) the administering authority explains why such differences cannot be taken into account using [the A-A method].

19 U.S.C. § 1677f-1(d)(1)(B). The statute defines the preconditions for applying the A-T methodology, but it does not limit in any way the application of the A-T methodology, should the preconditions be met. Rather,

the language largely tracks that of the general antidumping statute. 19 U.S.C. § 1673 ("If . . . the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, . . . then there shall be imposed upon such merchandise an antidumping duty . . . in an amount equal to the amount by which the normal value exceeds the export price . . . .").

Because the statute does not demand that Commerce limit its A-T rate calculation to sales found to be targeted, we ask whether Commerce's decision to use all of Apex's sales was reasonable. *See Chevron*, 467 U.S. at 842–44; *Koyo Seiko*, 36 F.3d at 1573. In its Issues and Decision Memorandum, Commerce explained that the sales passing the *Nails* test "would include only part of the U.S. sales which constitute the identified pattern. . . . The identified pattern is defined by all of the respondents' U.S. sales." Joint Appendix at 892. Commerce continued:

> When the Department applies the A-to-T method to all of the exporter's sales (including the higher-priced sales that the exporter used to mask its dumping), it eliminates the masked dumping by exposing 1) any implicit masking within the weighted-average U.S. sales price by basing the comparison on the transaction-specific U.S. sales price rather than the weighted-average U.S. sales price, and 2) any explicit masking between individual comparison results by not providing offsets for negative comparison results.

*Id.* at 893. We agree with the CIT's conclusion that Commerce's justification for applying the A-T methodology to all of Apex's sales—ensuring the maximum amount of dumping was uncovered and counterbalanced—was reasonable and thus entitled to deference. *Apex I*, 37 F. Supp. 3d at 1302.

Apex raises two counterarguments.  First, Apex argues Commerce's application of the A-T methodology to all sales is "particularly egregious" and "unduly punitive" in this case where only a negligible portion of sales (about 10 percent) were found to be targeted.  Apex Opening Brief at 48.  The CIT concluded this argument was never exhausted, *Apex I*, 37 F. Supp. 3d at 1302 n.7, and Apex has not shown the CIT's ruling to be an abuse of discretion.  Moreover, "[w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." *Chevron*, 467 U.S. at 866.  This question—whether Commerce should have segmented its calculation methodology based on the ratio of targeted to untargeted sales—goes to a "quintessential policy choice, committed to Commerce's discretion." *Tung Mung Dev. Co. v. United States*, 354 F.3d 1371, 1381 (Fed. Cir. 2004).[7]

Second, Apex points to a Commerce regulation for investigations known as the "Limiting Rule," which required that Commerce, in conducting investigations, "limit the application of the average-to-transaction method to those sales that constitute targeted dumping."  19 C.F.R. § 351.414(f)(2) (2008).  Commerce attempted to withdraw this regulation in 2008, but later cases invalidated the withdrawal. *See Gold E. Paper (Jiangsu) Co. v.*

---

[7]    *Tung Mung* goes on to say that deference is particularly warranted where "the agency has expressed its willingness to reexamine its approach in future cases." *Tung Mung*, 354 F.3d at 1381.  Commerce did just that— in AR8, Commerce instituted a tiered, "mixed" alternative methodology, depending on the portion of sales found to be targeted. *See Apex Frozen Foods*, No. 16-1789, slip op. at 8–10, 8 n.2.

*United States*, 918 F. Supp. 2d 1317, 1327–28 (Ct. Int'l Trade 2013); *see also Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1368 (Fed. Cir. 2017) ("<u>Commerce violated the requirements of the APA in withdrawing the regulation, leaving the regulation in force . . . .</u>").[8]

By its plain language, the Limiting Rule would seem to require Commerce only to use the A-T methodology on those sales found to be targeted. Yet the Limiting Rule only applies to investigations, not administrative reviews. Apex does not challenge this fact but argues that Commerce, by conducting its reviews according to the investigations statute, 19 U.S.C. § 1677f-1(d)(1), "has now essentially eliminated any meaningful distinctions between its targeted dumping methodology in [antidumping] reviews and investigations." Apex Opening Brief at 51. As such, Apex contends Commerce was obligated to explain why it would not follow the Limiting Rule.

We disagree with Apex's *ipse dixit* logic. Commerce did not imply that it would assume all requirements and follow all regulations associated with investigations, merely by adopting a single statutory scheme for reviews as well. And Apex cites no authority that Commerce, in doing so, bound itself to follow the Limiting Rule. This court has previously discussed the differences between investigations and reviews, in terms of their policy goals. *See Union Steel*, 713 F.3d at 1108.

Apex also fails to consider the context in which the Limiting Rule was originally enacted. The regulation, read as a whole, is revealing. Specifically, it stated that the A-A methodology was preferred for investigations, whereas, "[i]n a review, the Secretary normally will use

---

[8]    "In 2014, Commerce issued a final rule making withdrawal of the regulations effective May 22, 2014." *Mid Continent Nail Corp.*, 846 F.3d at 1372.

the [A-T] method." 19 C.F.R. § 351.414(c)(1)–(2) (2008). In other words, the Limiting Rule, § 351.414(f), was created at a time when the A-T methodology was restricted for investigations but used as a matter of course for reviews. We see little reason to extend the Limiting Rule's application to this case where Apex offers no compelling rationale for doing so and where Commerce's policies have clearly changed over time.

We agree with the CIT that Commerce's application of the A-T methodology to all of Apex's sales was consistent with the statute and reasonable.

B

Finally, Apex argues that, even if it were proper to use the A-T methodology for all sales, Commerce, in calculating the ultimate antidumping margin, only should have used zeroing for the subset of sales found to be targeted. In other words, Apex proposes segmenting the sales into targeted and non-targeted sales, using the A-T methodology for all, but only zeroing the targeted sales. Apex contends that Commerce failed to explain adequately its decision to use zeroing with all of Apex's sales.

Apex cites two cases that we find inapposite: *Dongbu Steel Co. v. United States*, 635 F.3d 1363 (Fed. Cir. 2011); *JTEKT Corp. v. United States*, 642 F.3d 1378 (Fed. Cir. 2011). *Dongbu* and *JTEKT* were precursors to *Union Steel*, addressing the question of whether Commerce could apply zeroing inconsistently—using it for the A-T methodology, but not for the A-A methodology. In those cases, this court determined Commerce had not provided sufficient justification for its differing practices, which were rooted in the same statute. *Dongbu*, 635 F.3d at 1371–72 ("[T]he government has not pointed to any basis in the statute for reading 19 U.S.C. § 1677(35) differently in administrative reviews than in investigations. . . . In the absence of sufficient reasons for interpreting the same statutory provision inconsistently, Commerce's action is

arbitrary."); *JTEKT*, 642 F.3d at 1384 ("While Commerce did point to differences between investigations and administrative reviews, it failed to address the relevant question—why is it a reasonable interpretation of the statute to zero in administrative reviews, but not in investigations?"). Ultimately, in *Union Steel*, we upheld Commerce's rationale. *Union Steel*, 713 F.3d at 1107–08 ("The question here, as in *Dongbu* and *JTEKT*, is whether it is reasonable for Commerce to use zeroing in administrative reviews even though it no longer uses zeroing in investigations. . . . Commerce's explanation now on review demonstrates that its varying interpretations are reasonable given the distinction between the comparison methodologies used in investigations and administrative reviews. Moreover, Commerce attributes the differing interpretations as necessary to comply with international obligations, while preserving a practice that serves recognized policy goals."); *see also Apex I*, 37 F. Supp. 3d at 1304 ("In *Union Steel*, Commerce provided the justification the Federal Circuit sought." (internal citation omitted)).

Here, we are not faced with a conflicting statutory interpretation demanding Commerce's explanation. Having already fully justified its decision to use the A-T methodology, consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce was not required to provide a separate justification for using zeroing on all or some of Apex's sales. This court has repeatedly condoned the use of zeroing as an important part of the A-T methodology, with the policy aim of addressing targeted dumping. *See Union Steel*, 713 F.3d at 1109 ("When examining individual export transactions, using the average-to-transaction comparison methodology, prices are not averaged and zeroing reveals masked dumping. This ensures the amount of antidumping duties assessed better reflect the results of each average-to-transaction comparison."); *U.S. Steel*, 621 F.3d at 1363 ("[T]he exception contained in § 1677f-1(d)(1)(B)

indicates that Congress gave Commerce a tool for combating targeted or masked dumping . . . . Commerce has indicated that it likely intends to continue its zeroing methodology in those situations, thus alleviating concerns of targeted or masked dumping. That threat has been one of the most consistent rationales for Commerce's zeroing methodology in the past.").

Commerce's use of zeroing coextensively with its use of the A-T methodology is reasonable and adequately supported.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the CIT, and Commerce's final results in AR7 are sustained.

## **AFFIRMED**

### COSTS

No costs.